**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| T.J., O.J., D.J., and J.J., infants by their next friend, Tasha Hudson | ) ) ) | |
| v. | ) ) ) | **Docket No. 3:18-cv-00096** |
| JON FREIVALD and JOHN DOE,<br>                              Defendants. | ) ) ) ) | |

_____

## DEFENDANT FREIVALD'S MEMORANDUM IN SUPPORT OF MOTION FOR  SUMMARY JUDGMENT

COMES NOW the Defendant, Jon Freivald by and through undersigned counsel, Bonnie J. Lepold, and in support of his Motion for Summary Judgment, filed pursuant to Fed. R. Civ. P. 56(a), states as follows:

### I.   STATEMENT OF PROCEEDINGS

This suit arises out of Plaintiffs' (infants by their next friend, Tasha Hudson) claim that they were falsely stopped and detained by Charlottesville City Police Officer, Jon Freivald, (hereinafter "Officer Freivald"), on October 7, 2016 during a traffic stop in Nelson County, Virginia, of a vehicle driven by Tasha Hudson. Compl. ¶ 8, ¶ 10, ¶ 12.  Ms. Hudson is the mother of the infant Plaintiffs who were occupants in the vehicle when the traffic stop occurred.  The Plaintiffs have sued Officer Freivald under the Fourth Amendment to the United States Constitution for unlawful seizure in violation of their constitutional rights and under state law for false imprisonment.

Officer Freivald's Motion For Summary Judgment asserts the affirmative defense of qualified immunity, because he acted lawfully, with a reasonable and good faith belief that

1

he was acting lawfully, and that he acted with objective reasonableness in stopping the vehicle in which the plaintiffs were passengers due to his direct observation of multiple traffic violations.

Officer Freivald moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56(a) and for a ruling that, as a matter of law, (1) he is entitled to qualified immunity for all federal claims; (2) Plaintiffs have failed to state a claim or cause of action for which relief may be granted for false imprisonment, in violation of Virginia law; and (3) if summary judgment is granted for Officer Freivald regarding the federal claims, but not the state claim, the Court should decline to exercise supplemental jurisdiction.

## II. STATEMENT OF FACTS

This suit arises out of an extra-territorial traffic stop initiated by Officer Freivald of the Charlottesville City Police Department on a vehicle driven by Tasha Hudson, in which the infant plaintiffs were passengers, on October 7, 2016 in Nelson County, Virginia.

The following facts are uncontroverted, stipulated to, or taken in the light most favorable to the nonmoving party[1].

1.  On the evening of Friday, October 7, 2016, Tasha Hudson was driving northbound on Route 29 returning home from a visit to Nelson County with her husband, adult son, and infant plaintiffs in her vehicle. Compl. 1. (TH T4:1-11).

2.  On the same date, Officer Freivald, a police officer employed by the City of Charlottesville Police Department, was driving northbound on Route 29 in his marked

---

[1] At the time of the filing of this Memorandum, three witnesses who had been deposed were still exercising their rights pursuant to Fed. R. Civ. P. 30(e). In this memorandum, Defendant cites to those transcripts even though they have not yet been completed. In the event that there are any material changes to those transcriptions, Defendant will amend this filing accordingly. For purposes of citing to the transcripts, Defendant will use the following abbreviations for the witnesses: TH (Tasha Hudson); JF (Jon Freivald); MKJ (Mark Johnson), MQJ (Marquis Johnson; and CT (Corey Thacker).

City of Charlottesville patrol car from his home in Nelson County on his way to Charlottesville to begin his midnight patrol shift which began at 10:00PM. (JF T5:15-T7:23).

3. Officer Freivald had been assigned to the midnight patrol shift with the City of Charlottesville for approximately 12 years. (JF T5:18-23).

4. Officer Freivald lives in Nelson County and the City of Charlottesville Police Department authorized his use of his marked patrol car for his commute to and from his work. (JF T7:23-24; T9:12-16).

5. Officer Freivald left his home on Friday, October 7, 2016 sometime between 8:00 PM and 8:15PM. (JF T8:10-13).

6. Officer Freivald commuted to work in his patrol vehicle alone.  He has never driven with another officer from Nelson County to Charlottesville. (JF T8:25-T9:11).

7. It generally takes Officer Freivald 40 minutes to get to work and it is his practice to arrive at the Charlottesville Police Department at approximately 9:00PM. He uses that extra hour to read through emails, watch some television and do other various tasks to get ready for roll call at 10:00PM.  (JF T8:14-24).

8. On October 7, 2016 at approximately 8:30PM, while commuting to work in Charlottesville, Officer Freivald came upon the vehicle driven by Ms. Tasha Hudson, a Honda minivan, while they were both traveling North on Route 29 in Nelson County. (See, Charlottesville Citizen Complaint completed by Tasha Hudson dated October 12, 2016 which lists the date and time of the occurrence of the event as 8:30PM on October 7, 2016 and Def. 2nd RFA[2]s # 15 & 16); (JF T7:8-

---

[2] RFAs is the abbreviation used for the Request for Admissions.  Defendant filed two separate RFAs.

3

16); (TH T5:1-3).

9.  Route 29 is a four-lane divided highway from the North Carolina border to northern Virginia which goes through Nelson County. (Def. 1st RFA #1).

10. Ms. Hudson was traveling in the left-hand lane at or below the posted speed limit when Officer Freivald saw her vehicle in front of him. (Def. 1st RFA #1); (TH T12: 5-25); (MKJ T13: 15-21); (MQJ T6:18-21).

11. Ms. Hudson and Mr. Mark Johnson admitted that Ms. Hudson traveled exclusively in the left-hand lane from the time she entered Rt. 29 North up to the point of the traffic stop. (TH T13:1-4); (MKJ T7:3-11).

12.  Ms. Hudson was traveling in the left lane for several miles with a vehicle in the right-hand lane next to her that she did not pass or overtake for several miles. (Def. 2nd RFA #13).

13. Officer Freivald flashed his headlights while he was behind Ms. Hudson's vehicle[3] but Ms. Hudson remained in the left-lane of travel. (Def. 1st RFA #1); (JF T13:20-25).

14. Officer Freivald thereafter activated his overhead blue lights when behind Ms. Hudson to initiate a traffic stop in Nelson County – outside of his jurisdictional limits – after observing multiple traffic violations[4]. (Def. 1st RFA #1; 2nd RFA #13); (JF

---

[3] Although in depositions Ms. Hudson denied seeing the flashing headlights of Officer Freivald's patrol car or the flashing headlights of any other cars behind her, in Plaintiffs' response to the Defendant's First Request for Admissions, Plaintiffs indicated that Officer Freivald did not activate his lights, but that he *flashed his headlights* when behind Ms. Hudson's vehicle. (Def. 1st RFA #1) (emphasis added).

[4] Officer Freivald observed a more fulsome threat to public safety than just two specific traffic infractions. More specifically, Officer Freivald described in his deposition that he saw four vehicles traveling along Rt. 29 North with two vehicles in each of the two northbound lanes. The two lead vehicles (the one in the left-lane being driven by Ms. Hudson and another unknown driver in the right-hand lane) were in lockstep with one another at identical speeds that Officer Freivald paced at 54 miles per hour. Ms. Hudson was keeping pace with the vehicle to her right, but her vehicle was just slightly behind the other in the right-hand lane. These two vehicles created an impasse that the two other vehicles in tow were attempting to pass by flashing headlights and trying to bridge the small gap between the two and almost merging into Ms. Hudson's vehicle. At that time, Officer Freivald then got behind Ms. Hudson's vehicle and flashed his headlights at her in an attempt to break the impasse. Ms. Hudson's son, Marquis

4

T14:1-18; T15:12-23; T35:23 – 36:16).

15. Ms. Hudson thereafter pulled her vehicle over on the left-hand side of the divided highway; not on the right-hand shoulder. (TH T13:11-17); (MKJ T8:4-14); (MQJ T7:15-25).

16. Throughout the entire duration of the traffic stop, Ms. Hudson and other occupants in her vehicle confirm that there was a second uniformed police officer present. (TH T14:8-23); (MKJ T9:19 – T10:2); (MQJ 10:7-25).

17. That second police officer seen by Ms. Hudson and the other occupants in her vehicle throughout the duration of the traffic stop was and is unnamed by Plaintiffs and has been referred to as "John Doe" in the Complaint. Compl.¶ 9.

18. The occupants of Ms. Hudson's vehicle noticed this second police officer as soon as Officer Freivald exited his vehicle and approached Ms. Hudson's driver's side window. (MKJ T9:19 – 10:12); (MQJ T10:7-25).

19. The occupants of Ms. Hudson's vehicle described the second police officer as a white man with dark colored hair and no facial hair. (TH T17:17-23); (MKJ T10:13-20); (MQJ T11:5-12).

20. The second officer never approached Ms. Hudson's vehicle and never engaged with any of the occupants of her vehicle. (TH T16:10-14); (MKJ T10:24 – 11:2); (MQJ T11:5-12).

21. The second officer stood at the rear of plaintiff's vehicle throughout the traffic stop -

---

Johnson, corroborates some of these observations of Officer Freivald when he testified that Ms. Hudson could not move over to the right-hand lane when Officer Freivald initiated the stop because there was a vehicle immediately to her right. (MQJ T:7:15 – T8: 5). Both Ms. Hudson and her husband, Mark Johnson, also corroborate some of Officer Freivald's additional observations in admitting that Ms. Hudson was driving exclusively in the left-hand lane and that she did not overtake or pass any the vehicle on her right for several miles. Def. 1st RFA #1; Def. 2nd RFA #13; (TH T13:1-4); (MKJ T7:3-11). However, for purposes of this motion, we will only focus on the traffic violations admitted to by Plaintiffs namely, violations of §§ 46.2-804 and 46.2-842.1.

5

just in front of Officer Freivald's patrol car. (MKJ T10:21-23); (MQJ T11:1-16).

22. Plaintiffs produced a videotape in discovery which depicts the encounter between Officer Freivald and Ms. Hudson. (Def. 1st RFP: video file attached to this filing)[5].

23. Plaintiffs admit that there are no other known recordings of the encounter between Officer Freivald and Ms. Hudson available. (Def. 2nd RFA #7-9); (MKJ T13:1-6; T14:19 – 15:3).

24. Plaintiffs admit that the videotape produced in discovery has not been altered, doctored or distorted in any way prior to being produced. (Def. 2nd RFA #7-9).

25. The videotape produced by Plaintiffs is only 2 minutes and 29 seconds in length. (see video attached).

26. According to Mark Johnson, the first seat passenger of the minivan, the videotaping started from the time that Officer Freivald came to the window. (MKJ T12:14 -13:6).

27. The videotape produced by Plaintiffs includes Officer Freivald attempting to explain the reason for the traffic stop and the involved traffic violations to Ms. Hudson. Both Ms. Hudson and at least one other male passenger engage with Officer Freivald and continue to question the officer concerning the nature of the traffic stop and the applicable traffic laws. (see video attached).

28. The following is a brief recitation of the relevant exchange on the videotape recording:

| | |
|---|---|
| Officer Freivald at 1:20: | "…if I am flashing lights, flashing lights, and you ignore me…" |
| Ms. Hudson at 1:22: | "But technically, a person that's not the police, I don't have to…" |
| Officer Freivald at 1:28: | "yes, ma'am…." |
| Ms. Hudson at 1:36: | "Oh wow! You told me something I didn't know…" |

---

[5] RFP is the abbreviation used for Request for Production.

Officer Freivald at 1:38:        "That is the purpose of my stop…to have a look and see… that is the law."

(see attached video).

29. After that statement by Officer Freivald at the 1:38 mark, there is further discussion about the speed Ms. Hudson was driving.  Throughout the videotape, there is a baby crying while occupants appear to be trying to soothe the baby with a bottle.  Ms. Hudson even laughs a bit during the exchange at this point in the videotape when discussing that she drives the speed limit.  The videotape concludes with the following:

Unknown male at 2:15:        "Appreciate it."

Officer Freivald at 2:16:        "Drive careful and you are free to go."

(see attached video).

30. The entire exchange between Officer Freivald and Ms. Hudson took place in only one encounter; the police officer only approached the driver's side window once and he never went to his patrol car to call in information about the driver's license or registration. (MKJ T15:12-15); (TH T22:1-17).

31. Officer Freivald issued no citation or summons as a result of his encounter with Ms. Hudson and the officer arrested no one during the traffic stop. (Def. 1st RFA #4); (MKJ T16:1-6).

32. The videotape produced ends at approximately 2 minutes and 16 seconds with Officer Freivald telling Ms. Hudson: "Drive careful and you are free to go." (see attached video).

33.  Officer Freivald and the second officer at the scene then briefly engaged one another

outside at the rear of Ms. Hudson's vehicle, observed by the some of the occupants in Ms. Hudson's vehicle. (MQJ T20:17 – 21:3); (JF T20:15 – 21:24); (CT T12:5-9).

34. Lt. Corey Thacker of the Nelson County Sheriff's Office testified in his deposition that he was on routine patrol traveling southbound on Route 29 South on October 7, 2016 around 8PM when he saw police overhead blue lights activated on the northbound side of the highway. (CT T8:3 – 10:6).

35. Lt. Thacker was driving a marked Nelson County Sheriff's patrol car and wearing his Sheriff's Department uniform consisting of a dark-brown long-sleeved shirt and dark-brown pants. (CT T6:13-21).

36. Lt. Thacker is a white male with dark hair, and on October 7, 2016, he had no facial hair. (CT Depo. Defense Exhibit 1).

37. Lt. Thacker reported the sighting of flashing blue lights of a patrol vehicle to the Nelson County dispatcher.  The Call Detail Report from October 7, 2016 indicates that the call from Lt. Thacker came in at exactly 8:30PM (20:30).  The audio recording of the dispatch call more specially reports that the call came in on Friday, October 7, 2016 at 20:30 and 14 seconds. (CT T8:3 -10:6; T15:22 - 17:19); (CT Depo. Exhibit 2); (Affidavit of Russell Gibson with Exhibits A & B).

38. Lt. Thacker testified that he drove to the first crossover on Rt. 29 and came back up Rt. 29 North to the area of the traffic stop with his overhead blue lights activated.  (CT T10:8-25).

39. Lt Thacker initially believed that it was the Virginia State Police involved in a traffic stop.  He then reported that it was not the Virginia State Police, but Albemarle County Police Department.  He later confirmed that his report to dispatch was incorrect as

8

he subsequently determined that it was City of Charlottesville Police Department. (CT T8:11-17).

40. Lt. Thacker recalled that the traffic stop took place on the left-hand side of the roadway of Rt. 29. (CT T15:17-21).

41. Upon approaching the traffic stop, Lt. Thacker pulled his patrol car immediately behind the police vehicle already on the scene, which he later determined to be Officer Freivald's patrol car.  Lt. Thacker saw a minivan immediately in front of Officer Freivald's vehicle. (CT T10:22-25).

42. Lt. Thacker exited his vehicle and walked up towards the front of Officer's Freivald's patrol vehicle. (CT T11:1-4).

43. Lt. Thacker met Officer Freivald as he was walking back towards his patrol car from Ms. Hudson's van. (CT T9:18-21; T11:17-19).

44. Lt. Thacker saw no other officers on the scene with Officer Freivald and Lt. Thacker had no other officers with him. (CT T11:20-24; T15:3-11).

45. Lt. Thacker briefly engaged in conversation with Officer Freivald at Freivald's patrol car for a couple minutes or less. (CT T12:5-15).

46. Lt. Thacker cleared the call to dispatch at 8:35PM (20:35 and 4 seconds according to the audio recording of the dispatch call). (CT T17:1-9); (Affidavit of Russell Gibson with Exhibits A & B).

47. Lt. Thacker recalled all the vehicles leaving the scene of the traffic stop at or around the time he cleared the call, but he was not certain as to which vehicle left the scene first. (CT T13:7-12).

48. Ms. Hudson and the two other adult occupants in her vehicle assert widely varying

9

estimates regarding the length of the traffic stop. Ms. Hudson estimated that the traffic stop took almost one hour in length. (TH T33:17-20).  Mr. Johnson estimated that it took about 25-30 minutes for the traffic stop (MKJ T15:8-12) and Mr. Marquis Johnson, while admitting that he is not good with timing events, believed that it was over 20 minutes. (MQJ T15:1-5 & T19:5-12).

49. The objective evidence establishes that the duration of the stop was much briefer than any of those estimates.

50. Officer Freivald estimated that the traffic stop lasted a total of 3-5 minutes in length. (JF T19:7-13).  The witnesses all indicate that two uniformed police officers were present for the entire duration of the traffic stop and that the videotape began recording at the moment that the officer arrived at the window. Compl. ¶9;(Def. 2nd RFA 7-9); (TH T14:8-23); (MKJ T13:1-6; T14:19 – 15:3); (MQJ T10:7-25).   The videotape produced is only 2 minutes and 16 seconds of actual conversation and it ends with the officer stating to Ms. Hudson: "Drive careful and you are free to go." (see video file).

51. Plaintiffs indicated that Officer Freivald was only at the window once and never came back a second time. (TH T22:1-17); (MKJ T15:12-15).  The Call Detail Report and dispatch recording indicates that Lt. Thacker was only at the traffic stop for 5 minutes or less (Affidavit of Russell Gibson with Exhibits A & B) and by all accounts, Lt. Thacker fits the description of the second officer who was at the rear of Ms. Hudson's vehicle engaged in a conversation with Officer Freivald at the end of the traffic stop (CT Depo. Exhibit 1); (MKJ T10:13-20); (MQJ 11:5-12) corroborating the estimate of 3-5 minutes for the duration of the traffic stop.  There is no credible evidence to

10

support any other version of the time estimate of the traffic stop.[6]

### III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See, *Celetex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, at 247-248 (emphasis in original). A fact is only material under this standard if a dispute over it would affect the outcome of the suit. *Id*. An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  The Supreme Court has further clarified this point

---

[6]"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  Here, between the videotape produced by Plaintiffs in discovery, the testimony of Lt. Corey Thacker, the audio recording of the call dispatch, the Call Detail Report from the Nelson County Sheriff's Office, and Officer Freivald's testimony that he has never commuted to work with another police officer, the Plaintiffs' estimation of the duration of the traffic stop is completely contradicted.  As such, this Court should not adopt Plaintiffs' version of the duration of the traffic stop for purposes of ruling on this motion for summary judgment.  The credible evidence, which includes a videotape that has not been altered or doctored in any way, supports that the traffic stop lasted no more than 5-8 minutes and that the second officer was in fact, Lt. Corey Thacker of the Nelson County Sheriff's Department (John Doe); not a second Charlottesville Police Officer.

concerning factual disputes: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

**Officer Freivald is entitled to qualified immunity as a matter of law.**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity safeguards that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). In determining whether an officer must be afforded qualified immunity, courts have traditionally engaged in a two-step analysis. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, a court determines whether a constitutional right has been violated. Second, "assuming that the violation of the right is established, courts must consider whether the right is clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). The United States Supreme Court has recently modified this approach in order to make it more flexible; courts no longer have to consider the two prongs sequentially, but may now review them in the order deemed to be most efficient. *Pearson v. Callahan*, 555 U.S. 223 (2009) ("[t]he judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances in the particular case at hand.").

**The extra-jurisdictional traffic stop did not violate the Fourth Amendment.**

Although the propriety of an extra-jurisdictional traffic stop resulting in an arrest or summons has not been addressed by the United States Court of Appeals for the Fourth Circuit, the Fourth Circuit has addressed the issue of whether an officer's *arrest* of an individual based on an investigation that was conducted outside of his territorial jurisdiction rises to the level of a constitutional violation. *Neal v. Luedtke*, 713 F.App'x 177, 181 (4th Cir. 2017) (this case explored the propriety of an arrest; not just a traffic stop where no citation or summons was given) (emphasis added)[7]. In that case, the Fourth Circuit upheld the trial court's determination that a city's law enforcement officers (City of Crisfield officers) were entitled to qualified immunity for the search of the plaintiff's residence located outside the lawful jurisdictional (in Somerset County) that led to his arrest and indictment and granted the defendant's summary judgment motion dismissing the plaintiff's §1983 complaint alleging violations under the Fourth and Fourteenth Amendments. *Id*. In so ruling, the Fourth Circuit (like the district court which granted the officers' motion) relied on *United States v. Atwell*, 470 F.Supp.2d 554 (D. Md. 2007), which held that an *arrest* outside a law enforcement officer's territorial jurisdiction does not, by itself, rise to the level of a constitutional violation. *Id*. (emphasis added).

More specifically, the Court in *Atwell* reasoned that, in order to properly assess the reasonableness of an extra-jurisdictional arrest, it would have to consider a number of

---

[7] Defendant Freivald notes that there is an important distinction to be made between many of the cases involving extra-territorial arrests and this case only involving an extra-territorial traffic stop. See generally, *Knowles v. Iowa*, 525 U.S. 113, 119, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)(e.g., the usual traffic stop is more analogous to a so-called "Terry stop," see *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest, and thus, it tends to be less intrusive than a formal arrest).

factors and weigh the "individual's interest in privacy and freedom from unreasonable seizures against [the government] and society's interest in protecting [citizens] from criminal conduct." *Atwell*, at 573 (quoting Nicholas L. Lopuszynski, Father Constitution, Tell Police to Stay on Their Own Side: Can Extra-jurisdictional Arrests Made in Direct Violation of State Law Ever Cross the Fourth Amendment's "Reasonableness" Line?, 53 DePaul L. Rev. 1347, 1369, 1392-1394 (Spring 2004)(also citing *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999); *Winston v. Lee*, 470 U.S. 753 (1985); *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 527 (7th Cir. 2001); *Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) (Arnold, C.J., dissenting)).

Although *Atwell* articulated a multi-factored test, it is clear that the primary and first factor to the analysis was the existence of probable cause. "Primary to the determination of the reasonableness of any warrantless arrest is, of course, the existence of probable cause for the arrest." *Atwell*, at 574. The other relevant factors in the reasonable analysis under the Fourth Amendment include: the degree of the officer's compliance with state law (factor 2); the fact that the officer was acting between political subdivisions of the same state (factor 3); the presence of exigent circumstances or lack thereof (factor 4); the location where the offense or crime originated (factor 5); an officer's knowledge that he was without authority to make an arrest (factor 6); an officer's blatant disregard of state law and the chain of command (factor 7); the motivation behind the state statute limiting territorial jurisdiction and whether it was designed to protect against unreasonable police behavior (factor 8); and the state's interest in making a particular type of arrest (factor 9). *Atwell*, at 574-75; see also *Byndon v. Pugh*, 350 F.Supp.3d 495 (N.D. W.Va. 2018) (citing *Neal*, 2016 WL 775406 at *6 (D. Md. Feb. 29, 2016).

14

Here, the plaintiffs allege that their Fourth Amendment rights were violated when Officer Freivald stopped Ms. Hudson's vehicle outside of Officer Freivald's lawful jurisdiction.  Although *Neal* is an unpublished opinion, and therefore is not regarded as binding precedent,[8] Officer Freivald submits that the Atwell multi-factored test, applied in *Neal* (and most recently applied in *Byndon v. Pugh*, 350 F.Supp.3d 495 (N.D.W.Va. 2018)[9] is a fitting manner in which to analyze this particular case.

Traffic stops, like arrests, implicate the Fourth Amendment. *U.S. v. Foreman*, 369 F.3d 776 (4th Cir. 2004). A traffic stop is constitutionally reasonable when a police officer has "probable cause to believe that a traffic violation has occurred[,]" *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), or "reasonable articulable suspicion that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). More specifically, under this standard, an officer is justified to "detain an automobile and its occupants pending inquiry into a vehicular violation." *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016) (citing *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 ) (internal quotation marks omitted). A stop may also be justified when a driver fails to comply with traffic laws. Id. (citing *United States v. Green*, 740 F.3d 275, 275, 279 n.1 (4th Cir. 2014). When assessing whether there is probable cause or articulable suspicion, the

---

[8] Unpublished opinions are not precedential. *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996); *United States v. Ruhe*, 191 F.3d 376, 392 (4th Cir. 1999).  But see *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006)(holding that unpublished decisions do not have precedential value, but "are entitled only to the weight they generate by persuasiveness of their reasoning") (citation omitted); see also Fourth Circuit Local Rule 32.1 ("A court may not prohibit or restrict the citation of federal judicial opinions, orders, judgments or other written dispositions that have been…designated as 'unpublished' … or issued on or after January 1, 2007").

[9] In *Byndon v. Pugh*, 350 F.Supp.3d 495 (N.D.W.Va. 2018), plaintiff alleged that his Fourth Amendment rights had been violated when Officer Pugh observed the plaintiff commit the minor traffic infraction of "driving too closely" (in violation of West Virginia's traffic laws) and seized the plaintiff outside of the officer's lawful jurisdiction. After applying the multi-factored test articulated in *Atwell*, the district court concluded that Officer Pugh's conduct was reasonable and he was entitled to qualified immunity as a matter of law. *Id*.

Court does not inquire as to the officer's subjective intent for stopping a vehicle. *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008). Rather, the question is "viewed objectively." *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769 1774, 135 L.Ed.2d 89 (1996). "Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.' " Id. (citing *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

Here, Plaintiffs admit that on October 7, 2016 Ms. Hudson was driving in violation of the Virginia traffic laws, Va. Code § 46.2-804 and Va. Code § 46.2-842.1.  More specifically, Plaintiffs admit that Ms. Hudson was driving for several miles in the left-hand lane of the four-lane divided highway without passing or overtaking the vehicle which was traveling next to her. (Def. 2nd RFA #13).  Ms. Hudson further admitted that she was traveling exclusively in the left-hand lane of the roadway from the time she entered the highway up through the point in which she was stopped by Officer Freivald and that there were cars passing her on the right throughout her travel. (TH T13:1-4; T13:15-22).

Va. Code Ann. § 46.2-804 provides in relevant part: "Whenever any roadway has been divided into clearly marked lanes for travel, drivers shall obey the following: (1) any vehicle proceeding at less than the normal speed of traffic at the time and place…, shall be driven in the lane nearest the right edge or right curb of the highway…*except* when overtaking and passing another vehicle…" (emphasis added).  In addition to Ms. Hudson's own admission, Officer Freivald personally observed her driving in violation of Va. Code Ann. § 46.2-804 with his own eyes.  For a significant time period while he was

16

behind Ms. Hudson, Officer Freivald observed that Ms. Hudson remained in the left-hand left without passing or overtaking the vehicle immediately next to her.

Furthermore, Plaintiffs admit that Officer Freivald flashed his headlights when he was behind their vehicle in the left travel lane and that she never moved to the right to give way, in violation of Va. Code Ann. § 46.2-842.1. (Def. 1st RFA #1).  That statute provides in pertinent part: "It shall be unlawful to fail to give way to overtaking traffic when driving a motor vehicle to the left and abreast of another motor vehicle on a divided highway.  *On audible or light signal, the driver of the overtaken vehicle shall move to the right* to allow the overtaking vehicle to pass as soon as the overtaken vehicle can safely do so." Va. Code Ann. § 46.2-842.1 (emphasis added).  Plaintiffs admit that Officer Freivald flashed his headlights and Ms. Hudson admitted that she did not ever move over to the right to allow him (or any other cars) to pass her on the left. In fact, Ms. Hudson never even traveled to the right lane or moved to the right-hand shoulder after Officer Freivald activated his overhead blue lights.  Ms. Hudson remained in the left-hand lanes throughout her drive on Rt. 29 North, including during the time of the traffic stop.  Her failure to yield to the right upon receiving a light signal (i.e., the flashing of Officer Freivald's headlights) is in direct violation of Va. Code Ann. § 46.2-842.1.

These traffic violations articulated above were personally observed by Officer Freivald.  As the Fourth Circuit has recognized, effecting the stop of a vehicle and citing a driver for such a traffic violation is permissible under the Fourth Amendment. See, *United States v. Mimms*, 155 F.3d 562 (4th Cir. 1998); *Pennsylvania v. Mimms*, 434 U.S. 106, 107, 98 S.Ct. 330, 331, 54 L.Ed.2d 331 (1977).  Given this, there was an

17

objectively reasonable basis for stopping Ms. Hudson' s vehicle, which overwhelmingly satisfied the first and primary *Atwell* factor.

Analysis under the second *Atwell* factor -- the degree of compliance with State law -- also makes it clear that no constitutional violation occurred. It is undisputed that under Va. Code Ann. § 15.2-1724, officers have authority to "lawfully go and be sent beyond the territorial limits" of the particular agency to which they are employed/assigned "whenever the necessity arises "…in response to any law enforcement emergency involving any immediate threat to life or public safety" (among other articulated necessities) and in such events, the officers shall maintain all of the same immunities from liability enjoyed by their respective locality or agency when acting within its territorial limits. See Va. Code Ann. § 15.2-1724.

Assuming *arguendo* that Officer Freivald violated Va. Code Ann. § 15.2-1724, in that Ms. Hudson's manner of driving did not involve an immediate threat to public safety[10], this alone does not necessarily mean that Officer Freivald has violated the plaintiffs' federal constitutional rights. Currently, the Fourth Circuit has yet to address

---

[10] There was no case law defining what constitutes an "immediate threat to life or public safety" as referenced in Va. Code Ann. §15.2-1724. Officer Freivald submits that this Court employ a commonsense and contextual approach in evaluating the validity of this traffic stop/detention that did not result in any arrest or citation being issued. More specifically, Defendant Freivald submits that the reasonableness of his actions must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight and that the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving. See, *Ryburn v. Huff*, -- U.S. --, 132 S.Ct. 987, 991-992, 181 L.Ed.2d 966 (2010) (citing *Graham v. Connor*, 490 U.S. 386, 396-397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Here, Officer Freivald's decision to initiate a traffic stop to investigate the continuing and on-going traffic violations being committed by Ms. Hudson was reasonable in the context of everything that he was personally and directly observing in those moments and over the course of several miles.
Moreover, the doctrine of qualified immunity extends protection to a "margin of error" where officers "navigate uncharted areas at the margins of constitutional criminal law." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir. 1987); see also, *Maciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992) ("officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). With no cases defining the language of Va. Code Ann. §15.2-1724's "immediate threat to life or public safety," there is no "clearly established" law and Officer Freivald cannot be held liable for a bad guess in a gray area.

this specific issue here, i.e., whether an officer violates the Fourth Amendment when he observes a traffic violation outside of his jurisdiction, unauthorized by state law, and then conducts a traffic stop (with no arrest or issuance of a citation) based on that extra-jurisdictional conduct. However, as noted in *Byndon v. Pugh*, 350 F.3d 495 (N.D. W.Va. 2018) other Circuit Courts of Appeal have provided some guidance.

The United States Court of Appeals for the Tenth Circuit has addressed a similar issue finding that compliance with state law may be relevant for analyzing reasonableness under a Fourth Amendment analysis, but such a violation does not mean there is a *per se* violation of the plaintiff's constitutional rights. *Swanson v. Town of Mountain View*, *Colo*., 577 F.3d 1196, 1203 (10th Cir. 2009). Specifically, the Court in Swanson concluded that a traffic stop outside the officers' home jurisdiction, even if unauthorized by state law, does not constitute an unlawful seizure under the Fourth Amendment. The Court also found that a reasonable police officer would not have known that an extra-jurisdictional traffic stop (without an arrest) within the same state constituted a violation of clearly established Fourth Amendment law when no dispute exists that the officer observed the traffic violation before effecting the stop.

Similarly, the United States Court of Appeals for the Seventh Circuit addressed the same issue when a plaintiff brought a § 1983 action against a county forest preserve district and individual district police officers asserting claims based on the Fourth and Fourteenth Amendments.  The Court found that despite the forest preserve officers' violation of state statutes governing their jurisdiction with respect to arrests made outside of the preserve, the arrest itself did not give rise to a § 1983 action for violation of the Fourth Amendment, without a showing that it was made in "blatant disregard of

19

state law and thus unreasonable; federal government was not enforcer of state law." *Pasiewicz v. Lake County Forest Preserve*, 270 F.3d 520, 527 (7th Cir. 2001).

Lastly, the Fourth Circuit has previously indicated when analyzing claims previously brought under § 1983 (although not necessarily based on a fact pattern akin to the case at bar), "the problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of law.'" *Street v. Surdyka*, 492 F.2d 368, 371 (4th Cir. 1974) (citing *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed 1495 (1945)).  The Court further noted that:

> There is significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other nonconstitutional mandate. The protection against arrest without probable cause, as well as that against unreasonable searches and seizures, stems directly from the Fourth Amendment. There is no such constitutional prohibition against arrests for investigation where probable cause exists. Certainly not every official impropriety gives rise to a finding that due process has been denied. *Id*.

Here, there is no indication that Officer Freivald was acting in blatant disregard of his authorized jurisdiction. In addition to Va. Code Ann. § 15.2-1724, which permits police to lawfully go and be sent beyond the territorial limits of their jurisdiction when the necessity arises "in response to any immediate threat to life or public safety," police officers, consistent with the Fourth Amendment, are permitted to make a warrantless arrest of an individual when the officer has probable cause to believe that the individual committed a crime in the officer's presence. Va. Code Ann. § 19.2-81.  In Virginia, violations referenced in this case for failing to keep right except to pass and failing to yield to the light signal of an overtaking vehicle constitute two separate "traffic infractions," but for arrest purposes, traffic infractions are treated as misdemeanors. Va.

20

Code Ann. §§§ 46.2-804, 46.2-842.1, 46.2-937[11].  Here, Officer Freivald personally observed Ms. Hudson transgressing multiple traffic laws while he was driving directly behind her vehicle.  The on-going and continued nature of these traffic violations for several miles only heightened Officer Freivald's concern for public safety and reinforced the reasonableness of his actions.

Significantly, Officer Freivald was not in violation of any known City of Charlottesville Police Department's governing orders or policies at the time of October 7, 2016.  The Take-Home Vehicle Program governing police officers permitted to use their patrol cars to drive to and from work which was in place at the time of the traffic stop involving Ms. Hudson did not prohibit Officer Freivald from making traffic stops while he was off-duty and said policy made no reference to any geographical limitations on those traffic stops.  That policy specifically stated in relevant part: "Off-duty officers in take-home vehicles should not routinely make vehicle stops for traffic infractions; however, the severity of the infraction and the hazard posed may dictate action by the officer."   (See Affidavit of Corporal Lisa Best and attached Exhibit C – General Order). Again, given the City of Charlottesville's Police Department General Order in place, Officer Freivald was acting within those governing policies when he initiated a traffic stop of Ms. Hudson's vehicle given her admitted on-going and multiple traffic infractions.

Analysis under the third *Atwell* factor also suggests no constitutional violation

---

[11] In addition to Virginia state law, the Supreme Court has repeatedly recognized that police officers do not violate the Fourth Amendment by arresting drivers for minor traffic infractions. *Virginia v. Moore*, 553 U.S. 164, 171 (2008)("In a long line of cases, we have said that when an officer has probable cause to believe that a person committed even a minor crime in his presence …[t]he arrest is constitutionally reasonable."); see also, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (arrest for seatbelt violation in presence of officer did not violate Fourth Amendment).  Unlike in the case here which only involves a traffic stop (akin to a *Terry* stop), these cited cases involve the much more intrusive – a full blown arrest for a minor traffic offense and thus, these cases are merely instructive to the analysis at hand.

because Officer Freivald was acting between two political subdivisions within the Commonwealth of Virginia. In fact, there is no dispute that Officer Freivald stopped and seized plaintiffs within the Commonwealth of Virginia – but within approximately 30 miles of his authorized jurisdiction and part of his commute into his shift.  Even if Officer Freivald acted extra-territorily, "[c]ourts have viewed as mitigating if the law enforcement officer acting extra-territorily was simply from another political subdivision within the same state." *Neal*, No. RDB-15-1030, 2016 WL 775406, at *6 (D. Md. Feb. 29, 2016) (citing *Atwell*, 470 F.Supp.2d at 576 n.34).

Additionally, analysis under the remaining *Atwell* factors 4, 5, 6, 7, 8, and 9 weigh in favor of the reasonableness of the arrest. As mentioned above, there is sufficient evidence demonstrating that Officer Freivald personally observed the multiple, on-going and continuing traffic infractions for several miles and he reasonably believed such to be a threat to public safety thereby granting him authority to initiate a stop beyond his territorial limits pursuant to Va. Code Ann § 15.2-1724 and Va. Code Ann. § 19.2-81 (factor 6). Moreover, there is no evidence to indicate that Officer Freivald intended to act outside of his territorial jurisdiction or that he was in blatant disregard of the law (factor 7).  Officer Freivald was not setting up a stationary roadblock/radar and/or stakeout outside of his jurisdiction.  He was merely driving into work for his upcoming shift when he happened upon Ms. Hudson's vehicle and her on-going and continuing traffic violations.  There is absolutely no evidence that he had a pattern or practice of initiating traffic stops outside of his jurisdiction. Lastly, Officer Freivald saw what seemed to be a dangerous, ongoing emergency situation caused by Ms. Hudson's continued travel in the left lane for several miles, neither passing nor overtaking a vehicle to her right and

22

failing to adhere to Virginia law by not moving to the right-hand lane when there was a visible light signal given by an overtaking vehicle (Officer Freivald's flashing headlight's from his overtaking patrol car) (factor 4), in violation of the purpose behind the creation of Va. Code § 15.2-1724 (factor 9).

The totality of the *Atwell* factors overwhelmingly establish the reasonableness of Officer Freivald's conduct. Accordingly, this Court must find that Officer Freivald is entitled to qualified immunity as a matter of law.

**Even assuming, for purposes of argument only, Officer Freivald committed a constitutional violation, any such violation was not clearly established at the time of the stop and arrest.**

In this case, Plaintiffs rely on basic Fourth Amendment search and seizure jurisprudence. Plaintiffs also assert that the mere fact that Officer Freivald initiated a traffic stop of Ms. Hudson outside of his jurisdictional limits, he violated Virginia law. However, without addressing whether Officer Freivald violated any Virginia law or statutory authority, such a violation does not necessarily mean the Defendant violated the plaintiffs' federal constitutional rights. Moreover, the plaintiffs have failed to provide precedent to support the conclusion that the Officer Freivald's actions amounted to a constitutional violation.[12]

As discussed above, the Fourth Circuit holds that "there is significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other non-

---

[12] In the Complaint, Plaintiffs allege that Ms. Hudson violated no traffic laws as she was driving home from Nelson County.  However, to the contrary, Plaintiffs' response to Requests for Admissions and Ms. Hudson's response in her depositions confirm that she was driving in violation of Va. Code Ann. §§ 46.2-804 and 46.2-842.1. (Def. 1st RFA #1); (Def. 2nd RFA #13); (TH T13:1-4; T13:15-22).

23

constitutional mandate." *Surdyka*, 492 F.2d at 371. In the context of traffic stops, *Atwell, supra.,* demonstrates that compliance with state law is only one factor that may be relevant in the overall analysis. In short, relevant precedent does not establish that a traffic stop that was based on observing multiple, on-going traffic infractions just outside an officer's home jurisdiction, even if unauthorized by state law, constitutes an unlawful seizure under the Fourth Amendment. A reasonable police officer would not have known at the time of this incident that extra-jurisdictional, but within the same state (and within his commute to and from his assigned patrol shift), observations that establish reasonable suspicion to stop a vehicle, would constitute a violation of clearly established Fourth Amendment law.  See, *Byndon v. Pugh*, 350 F.Supp.3d 495, 508 (N.D. W.Va. 2018).

**False Imprisonment Claim**:

Plaintiffs also allege common law false imprisonment in their Complaint.  This claim should be dismissed because, as aforementioned, Officer Freivald had a reasonable articulable suspicion to initiate a traffic stop of Ms. Hudson's vehicle.  Lawful detention is an absolute defense to the state law claims[13].

"False imprisonment is the restraint of one's liberty without any sufficient legal excuse." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011). If an arrest is lawful, "the plaintiff cannot prevail on a claim of false imprisonment." *Id*. In Virginia, a uniformed officer generally "may arrest, without a warrant, any person who commits any crime in the

---

[13] If the federal claims are dismissed, the court must determine whether to exercise its discretion to address state law claims.  Because the state law claims have been briefed and are without merit, "the balance between judicial efficiency and comity is struck in favor of the federal court's disposition of the state claims." *Carter v. Khan*, 2015 U.S. Dist. LEXIS 149955 (E.D. Va., Nov. 4, 2015) citing *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994).

24

presence of the officer." Va. Code Ann. § 19.2-81.  Here, Officer Freivald personally observed Ms. Hudson in violation of multiple traffic laws.  Officer Freivald had a sufficient legal basis to initiate a traffic stop, and the ensuing brief detention was therefore also lawful.

If the Court grants summary judgment for the federal claims, but not the state law claims, the state law claims should be dismissed.  "Where § 1983 claims over which a district court otherwise would have original jurisdiction are subject to dismissal, there remains no basis to exercise supplemental or pendant jurisdiction over state tort claims. 28 U.S.C. 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim … if… the district court has dismissed all claims over which it has original jurisdiction."); *White v. Ammar's, Inc.*, 836 F.2d 1343, 1988 WL 1077 (4th Cir. 1988) ("Because there is no subject matter jurisdiction, White's additional claims regarding pendant jurisdiction were properly dismissed.")  Because plaintiffs' 1983 claims are subject to resolution in defendant's favor, subject matter jurisdiction over plaintiff's tort claims does not exist, and they must be dismissed without prejudice pursuant to Fed. R. Civ. P. 12(h)(3).  *Dawson v. Pisarek*, No.1:15cv993 (AJT/JTA), 2017 U.S. Dis. LEXIS 135463 (E.D. Va. 21, 2017); See also *Williams v. Wallace*, 2016 U.S. Dist. LEXIS 156759 (E.D. Va. 2016).

**CONCLUSION**

For all the foregoing reasons, and for any additional reasons that may be argued at a hearing on this motion, Defendant Freivald, by counsel, respectfully requests that this Court grant his Motion for Summary Judgment and dismiss all claims with prejudice.

Respectfully Submitted,

JON FREIVALD
By Counsel

_____/s/_____
Bonnie J. Lepold, (VSB #44926)
Lepold & Freed, PLLC
414 East Market Street, Suite A
Charlottesville, Virginia 22902
(434) 282-2380 (telephone)
(434) 282-2382 (facsimile)
blepold@lepoldfreed.com
Counsel for Jon Freivald

## **MAILING CERTIFICATE**

I HEREBY CERTIFY that on the 5th day of March 2020, I mailed via first-class mail and electronically sent the foregoing Memorandum in Support of Motion for Summary Judgment to Jeff Fogel, Esq., 913 E. Jefferson Street, Charlottesville, VA 22902 (email: jeff.fogel@gmail.com).

_____/s/_____
Bonnie J. Lepold, (VSB #44926)
Counsel for Jon Freivald

26