## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| T.J., O.J., D.J., and J.J., infants by their next friend, Tasha Hudson | ) ) ) | |
| v. | ) ) ) | **Docket No. 3:18-cv-00096** |
| JON FREIVALD and JOHN DOE,                Defendants. | ) ) ) ) | |

## DEFENDANT FREIVALD'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Jon Freivald by and through undersigned counsel, Bonnie J. Lepold, and in opposition of Plaintiffs' Motion for Summary Judgment, filed pursuant to Fed. R. Civ. P. 56(a), states as follows:

### I.  STATEMENT OF PROCEEDINGS

This suit arises out of Plaintiffs' (infants by their next friend, Tasha Hudson) claim that they were falsely stopped and detained by Charlottesville City Police Officer, Jon Freivald, (hereinafter "Officer Freivald"), on October 7, 2016 during a traffic stop in Nelson County, Virginia, of a vehicle driven by Tasha Hudson. Compl. ¶ 8, ¶ 10, ¶ 12. Ms. Hudson is the mother of the infant Plaintiffs who were occupants in the vehicle when the traffic stop occurred. The Plaintiffs have sued Officer Freivald under the Fourth Amendment to the United States Constitution for unlawful seizure in violation of their constitutional rights and under state law for false imprisonment.

Plaintiffs position is that because Officer Freivald stopped the vehicle outside of the City of Charlottesville he was acting as a private citizen, that he had no authority to conduct

1

a traffic stop for what Plaintiffs' term "minor traffic violations" and that the situation did not amount to a breach of peace sufficient to warrant a private citizen's arrest/detention. Plaintiffs further take the position that Officer Freivald acted "under color of law" because he was in his Charlottesville Police Department uniform operating his marked police vehicle and utilized his police overhead blue lights to initiate the traffic stop.

Plaintiffs' exclusive focus on the status of Officer Freivald as an alleged "private citizen" is unsupported by current case law, which has adopted a multi-factored analysis first articulated in *United States v. Atwell*, 470 F.Supp.2d 554 (D. Md. 2007). Moreover, Plaintiffs claim that there are genuine issues of material fact which must be resolved with respect to Plaintiffs' motion. More specifically, Plaintiffs' motion fails to include the personal observations of Officer Freivald which indicate more than just his personal observation of multiple traffic infractions (and Ms. Hudson's own admission of said traffic violations), but an on-going and escalating dangerous safety hazard between multiple vehicles on a public highway created by the unlawful actions of Ms. Hudson's vehicle.[1] (JF T11:6 – 14:10); (Def. 1st RFA #1); (Def. 2nd RFA #13).

Notably, Defendant further submits that should this Court apply the *Atwell* multi-factored test in this case there are sufficient facts on which no genuine issue exists to support Officer Freivald's motion for summary judgement. Under this approach, Plaintiffs admitted that Ms. Hudson's manner of driving was in violation of at least two separate traffic laws, Va. Code Ann. §§ 46.2-804 & 46.2-842.1, thereby providing Officer Freivald a sufficient

---

[1] At the time of the filing of this Memorandum in Opposition, three witnesses who had been deposed were still exercising their rights pursuant to Fed. R. Civ. P. 30(e). In this memorandum, Defendant cites to those transcripts even though they have not yet been completed. In the event that there are any material changes to those transcriptions, Defendant will amend this filing accordingly. For purposes of citing to the transcripts, Defendant will use the following abbreviations for the witnesses: TH (Tasha Hudson); JF (Jon Freivald); MKJ (Mark Johnson), MQJ (Marquis Johnson; and CT (Corey Thacker). RFAs is the abbreviation used for the Request for Admissions. Defendant filed two separate RFAs.

basis, amongst the other totality of the Atwell factors, to initiate an extra-teritorial traffic stop which was not in violation of Plaintiffs' Forth Amendment rights under the federal constitution. (see, Defendant's Motion for Summary Judgment previously filed and fully incorporated herein).

**STATEMENT OF FACTS**

This suit arises out of an traffic stop in Nelson County, Virginia, on October 7, 2016 initiated by Officer Freivald of the Charlottesville City Police Department. The stopped vehicle was driven by Tasha Hudson, and the infant Plaintiffs were among her passengers.

The following facts are taken in the light most favorable to Officer Freivald, as the nonmoving party, and show that there are material facts in dispute as they pertain to the Plaintiffs' theories under which they are entitled to summary judgement.

1. On the evening of Friday, October 7, 2016, Tasha Hudson was driving northbound on Route 29 returning home from a visit to Nelson County with her husband, adult son, and infant plaintiffs in her vehicle. Compl. 1. (TH T4:1-11).

2. On the same date, Officer Freivald, a police officer employed by the City of Charlottesville Police Department, was driving northbound on Route 29 in his marked City of Charlottesville patrol car from his home in Nelson County on his way to Charlottesville to begin his midnight patrol shift which began at 10:00PM. (JF T5:15-T7:23).

3. Officer Freivald had been assigned to the midnight patrol shift with the City of Charlottesville for approximately 12 years. (JF T5:18-23).

4. Officer Freivald lives in Nelson County and the City of Charlottesville Police

Department authorized his use of his marked patrol car for his commute to and from his work. (JF T7:23-24; T9:12-16).

5. Officer Freivald left his home on Friday, October 7, 2016 sometime between 8:00 PM and 8:15PM. (JF T8:10-13).

6. Officer Freivald commuted to work in his patrol vehicle alone. Despite the assertions of Ms. Hudson and two of her occupants, Officer Freivald has never driven with another officer from Nelson County to Charlottesville. (JF T8:25-T9:11).

7. It generally takes Officer Freivald 40 minutes to get to work and it is his practice to arrive at the Charlottesville Police Department at approximately 9:00PM. He uses that extra hour to read through emails, watch some television and do other various tasks to get ready for roll call at 10:00PM. (JF T8:14-24).

8. On October 7, 2016 at approximately 8:30PM, while commuting to work in Charlottesville, Officer Freivald came upon the vehicle driven by Ms. Tasha Hudson, a Honda minivan, while they were both traveling North on Route 29 in Nelson County. (See, Charlottesville Citizen Complaint completed by Tasha Hudson dated October 12, 2016 which lists the date and time of the occurrence of the event as 8:30PM on October 7, 2016 and Def. 2nd RFA # 15 & 16); (JF T7:8-16); (TH T5:1-3).

9. Route 29 is a four-lane divided highway from the North Carolina border to northern Virginia which goes through Nelson County. (Def. 1st RFA #1).

10. According to Ms. Hudson, she was traveling in the left-hand lane at the posted speed limit with her cruise control engaged. However, Officer Freivald testified that he paced Ms. Hudson's vehicle below the posted speed limit (at 54 miles per hour)

4

when he was behind her vehicle. (Def. 1st RFA #1); (TH T12: 5-25); (MKJ T13: 15-21); (MQJ T6:18-21), but see also (JF T11:13-25).

11. Ms. Hudson and Mr. Mark Johnson admitted that Ms. Hudson traveled exclusively in the left-hand lane from the time she entered Rt. 29 North up to the point of the traffic stop. (TH T13:1-4); (MKJ T7:3-11).

12.  It is established that Ms. Hudson was traveling in the left lane for several miles with a vehicle in the right-hand lane next to her that she did not pass or overtake for several miles. (Def. 2nd RFA #13). This admission alone establishes that Ms. Hudons committed a traffic violation before Officer Freivald initiated a traffic stop of her vehicle. (See, Va. Code Ann. § 46.2-804).

13. It is established that Ms. Hudson saw Officer Freivald flashing his headlights while behind Ms. Hudson's vehicle and that Ms. Hudson did not move to the right to allow him to pass. (Def. 1st RFA #1)[2].  This admission alone establishes that Ms. Hudson committed a second  traffic violation before Officer Freivald initiated a traffic stop of her vehicle. (See, Va. Code Ann. § 46.2-841.2).

14. In addition to Plaintiffs' admissions of these two traffic violations, Officer Freivald submits that there are material facts at issue bearing upon Plaintiffs' Motion For Summary Judgement, specifically the issue of whether there were reasonable grounds to suspect additional violations of law and/or a circumstance involving an

---

[2] Although in depositions Ms. Hudson denied seeing the flashing headlights of Officer Freivald's patrol car or the flashing headlights of any other cars behind her, in Plaintiffs' response to the Defendant's First Request for Admissions, Plaintiffs unequivocally indicated that: "Officer Freivald did not activate his lights, he *flashed his headlights* when he was behind Ms. Hudson's vehicle. (Def. 1st RFA #1) (emphasis added). Pursuant to Fed. R. Civ. P. 36(b), Plaintiffs' admissions are conclusively established facts in this case.

immediate threat to life or public safety. More specifically, Officer Freivald's attention was drawn to Ms. Hudson's vehicle in the left lane as he approached: "My initial observation was a cluster of four vehicles, one of which was flashing its high beams fairly regularly. It was …the second vehicle in the left lane. The first vehicle in the left lane being Ms. Hudson's vehicle. There was a vehicle to the right of her, a little bit forward of her, that was traveling at an identical speed to Ms. Hudson." (JF T11:6-12). "Which as I approached and paced the situation, my calibrated speedometer showed me it was 54 miles an hour." (JF T11:14-16). "As I stated, the one vehicle had been flashing its lights. The other vehicle, which was a second vehicle in the right lane, was – it appeared to me to be trying to get around her but there was not enough room between her and the first vehicle in the right lane for him to make the gap. So as he was approaching, he was cutting in close, cutting in close, but not getting around." "…He was in the right lane. He was trying – what he was trying to do was get up so he could come around he front of Ms. Hudson. But the vehicle in front – the vehicle in front of him didn't give him enough room to clear Ms. Hudson's vehicle. So he was coming up, he was getting close and kind of nudging left a little but close to Ms. Hudson's vehicle. He did that a couple of times." (JF T12:3-24). "…And for the course of a half to three quarters of a mile we continued in this deadlock, at which point I came up into – I became the third vehicle in the right lane." (JF T13:12-15).

15. Officer Freivald then moved his vehicle to the left lane immediately behind Ms. Hudson's vehicle after the previous vehicle that had been flashing lights behind Ms. Hudson's vehicle noticed his police vehicle and backed up. (JF T13:17-19).

6

16. Officer Freivald then flashed his headlights while he was behind Ms. Hudson's vehicle[3] but Ms. Hudson remained in the left-lane of travel. (Def. 1st RFA #1); (JF T13:20-25).  Officer Freivald flashed his high beams on three separate occasions – one quick flash; one longer flash; and another that he held for several seconds to try to get her attention to get her to pull over and break the impasse. (JF T13:20-25).

17. Officer Freivald felt that in his judgment the manner of Ms. Hudson's operation of her vehicle and the ongoing reactions of other motorists to her manner of operation was a budding road rage incident.  One of the other vehicles was flashing its lights and another other vehicle was trying to get around and in front of Ms. Hudson and getting too close to her vehicle in its attempts to cut into her lane in front of her.  Officer Freivald observed what was in effect a rolling roadblock created by Ms. Hudson's failure to heed the flashing lights of two different vehicles, including his own, and failing to move to the right.  This created a significant safety hazard and threat to the public– and the situation escalated over the course of about a mile. (JF T14:1-10).

18. Contrary to assertions made by Plaintiffs, Officer Freivald testified at his deposition that he was acting in an effort to address "what, in [his] judgment, was a matter of public safety." (JF T30:13-14).

19. Officer Freivald thereafter activated his overhead blue lights when behind Ms. Hudson to initiate a traffic stop in Nelson County – outside of his jurisdictional limits

---

[3] Again, despite her deposition testimony to the contrary, in Plaintiffs' response to the Defendant's First Request for Admissions, Plaintiffs indicated that Officer Freivald did not activate his lights, but that he *flashed his headlights* when behind Ms. Hudson's vehicle. (Def. 1st RFA #1) (emphasis added). Pursuant to Fed. R. Civ. P. 36(b), Plaintiffs' admissions regarding this matter are conclusively established.

– after observing multiple traffic violations[4]. (Def. 1st RFA #1; 2nd RFA #13); (JF T14:1-

---

[4] Officer Freivald observed a more fulsome threat to public safety than just two specific traffic infractions referenced previously in Defendant's Motion for Summary Judgment. More specifically, Officer Freivald described in his deposition that he saw four vehicles traveling along Rt. 29 North with two vehicles in each of the two northbound lanes. The two lead vehicles (the one in the left-lane being driven by Ms. Hudson and another unknown driver in the right-hand lane) were in lockstep with one another at identical speeds that Officer Freivald paced at 54 miles per hour. Ms. Hudson was keeping pace with the vehicle to her right, but her vehicle was just slightly behind the other in the right-hand lane. These two vehicles created an impasse that the two other vehicles in tow were attempting to pass by flashing headlights and trying to bridge the small gap between the two and almost merging into Ms. Hudson's vehicle. At that time, Officer Freivald then got behind Ms. Hudson's vehicle and flashed his headlights at her in an attempt to break the impasse. Ms. Hudson's son, Marquis Johnson, corroborates some of these observations of Officer Freivald when he testified that Ms. Hudson could not move over to the right-hand lane when Officer Freivald initiated the stop because there was a vehicle immediately to her right. (MQJ T:7:15 – T8: 5). Both Ms. Hudson and her husband, Mark Johnson, also corroborate some of Officer Freivald's additional observations in admitting that Ms. Hudson was driving exclusively in the left-hand lane and that she did not overtake or pass any the vehicle on her right for several miles. Def. 1st RFA #1; Def. 2nd RFA #13; (TH T13:1-4); (MKJ T7:3-11). In the videotape produced by Plaintiffs, Ms. Hudson admits that she was not focused on what was behind her – she was looking ahead; not behind her. (see attached videotape). Defendant submits that the traffic violations previously admitted to by Plaintiffs namely, violations of Va. Code Ann. §§ 46.2-804 and 46.2-842.1, are a sufficient basis to analyze this case applying the *Atwell* factors. The additional personal observations of Officer Freivald referenced above are only otherwise important should this Court focus on whether Officer Freivald was acting as a private citizen intervening for a breach of the peace committed in his presence or whether Officer Freivald had authority pursuant to Va. Code Ann § 15.2-1724. Although Officer Freivald does not believe that this is the proper manner in which to analysis this case, it is submitted that these additional observations create genuine issues of material fact sufficient to deny Plaintiffs' motion for summary judgment and alternatively, if found, establish dangerous conduct, regardless whether under the influence of intoxicants, constituting a breach of the peace committed in Officer Freivald's presence. See, *Hudson v. Commonwealth*, 266 Va. 371, 585 S.E.2d 583 (2003) (Dangerous driving on a public highway so as to imperil others (not only the off-duty officer in an unmarked car) clearly constituted a breach of peace sufficient to justify a citizen's arrest by the off-duty officer). Notably, other jurisdictions have held, and legal treatises recognize, that dangerous or reckless driving, including DUI, amounts to a breach of the peace allowing a private citizen to stop, detain, or arrest the driver. *See, e.g.,* 11 C.J.S. *Breach of the Peace* § 5 (1995) ("[T]he operation of a motor vehicle while intoxicated is an activity which threatens the public security and involves violence, and as such, it amounts to a breach of the peace."); 12 Am.Jur.2d *Breach of Peace and Disorderly Conduct* § 9 (1997) (driving while intoxicated and reckless driving included among the varied acts and conduct held or recognized to constitute a breach of the peace); 5 Am.Jur.2d *Arrest* § 67 (1995) (officer may arrest for DUI "even where the power to arrest without warrant is limited to breaches of the peace, since this offense is held to constitute a breach of the peace, or at least a prospective or anticipated breach."). Supporting the treatises' statements are cases from a number of different jurisdictions. *E.g., Edwards v. State,* 462 So.2d 581, 582 (Fla.Dist.Ct.App.1985); *People v. Niedzwiedz*, 268 Ill.App.3d 119, 205 Ill.Dec. 837, 644 N.E.2d 53, 55 (1994); *Commonwealth v. Gorman,* 288 Mass. 294, 192 N.E. 618, 620 (1934); *City of Troy v. Cummins,* 107 Ohio App. 318, 159 N.E.2d 239, 242 (1958); *Romo v. State,* 577 S.W.2d 251, 253 (Tex.Crim.App.1979); *State ex rel. State v. Gustke,* 205 W.Va. 72, 516 S.E.2d 283, 291-92 (1999); *City of Waukesha v. Gorz,* 166 Wis.2d 243, 479 N.W.2d 221, 223 (Ct.App.1981); *accord Ruiz v. State,* 907 S.W.2d 600, 604 (Tex.Ct.App.1995); *Pringle*

18; T15:12-23; T35:23 – 36:16).

20. Ms. Hudson thereafter pulled her vehicle over on the left-hand side of the divided highway; not on the right-hand shoulder. (TH T13:11-17); (MKJ T8:4-14); (MQJ T7:15-25).

21. Throughout the entire duration of the traffic stop, Ms. Hudson and other occupants in her vehicle confirm that there was a second uniformed police officer present. (TH T14:8-23); (MKJ T9:19 – T10:2); (MQJ 10:7-25).

22. That second police officer seen by Ms. Hudson and the other occupants in her vehicle throughout the duration of the traffic stop was and is unnamed by Plaintiffs and has been referred to as "John Doe" in the Complaint. Compl.¶ 9.   Ms. Hudson and her occupants maintain that this second uniformed officer at the traffic stop was a City of Charlottesville Police Officer who arrived on the scene in the same vehicle as Officer Freivald. (TH T17:1-23); (MKJ T9:19 – 10:20); (MQJ T10:7 -T11:12).  The testimony of Officer Freivald and Lt. Corey Thacker of the Nelson County Sheriff's Office make it clear that the second officer was, in fact, Lt. Thacker, that he was traveling in his own marked patrol cruiser from the Nelson County Sheriff's Office, and that Officer Freivald was alone in his own patrol car. (JF T8:25 -T9:11); (CT T11:20-24; T15:3-11).

23. The occupants of Ms. Hudson's vehicle noticed this second police officer as soon as Officer Freivald exited his vehicle and approached Ms. Hudson's driver's side window. (MKJ T9:19 – 10:12); (MQJ T10:7-25).

---

*v. State,* 732 S.W.2d 363, 368 (Tex.Ct.App.1987); *Yates v. State,* 679 S.W.2d 534, 537 (Tex.Ct.App.1984).

9

24. The occupants of Ms. Hudson's vehicle described the second police officer as a white man with dark colored hair and no facial hair. (TH T17:17-23); (MKJ T10:13-20); (MQJ T11:5-12).

25. The second officer never approached Ms. Hudson's vehicle and never engaged with any of the occupants of her vehicle. (TH T16:10-14); (MKJ T10:24 – 11:2); (MQJ T11:5-12).

26. The second officer stood at the rear of plaintiff's vehicle throughout the traffic stop - just in front of Officer Freivald's patrol car. (MKJ T10:21-23); (MQJ T11:1-16).

27. Plaintiffs produced a videotape in discovery which depicts the encounter between Officer Freivald and Ms. Hudson. (Def. 1st RFP: video file attached to this filing).

28. Plaintiffs admit that there are no other known recordings of the encounter between Officer Freivald and Ms. Hudson available. (Def. 2nd RFA #7-9); (MKJ T13:1-6; T14:19 – 15:3).

29. Plaintiffs admit that the videotape produced in discovery has not been altered, doctored or distorted in any way prior to being produced. (Def. 2nd RFA #7-9).

30. The videotape produced by Plaintiffs is only 2 minutes and 29 seconds in length. (see video attached).

31. According to Mark Johnson, the first seat passenger of the minivan, the videotaping started from the time that Officer Freivald came to the window. (MKJ T12:14 -13:6).

32. The videotape produced by Plaintiffs includes Officer Freivald attempting to explain the reason for the traffic stop and the involved traffic violations to Ms. Hudson. Both Ms. Hudson and at least one other male passenger engage with Officer Freivald and continue to question the officer concerning the nature of the traffic stop and the

applicable traffic laws.  (see video attached).

33. The following is a brief recitation of the relevant exchange on the videotape recording:

| | |
|---|---|
| Officer Freivald at 1:20: | "…if I am flashing lights, flashing lights, and you ignore me…" |
| Ms. Hudson at 1:22: | "But technically, a person that's not the police, I don't have to…" |
| Officer Freivald at 1:28: | "yes, ma'am…." |
| Ms. Hudson at 1:36: | "Oh wow! You told me something I didn't know…" |
| Officer Freivald at 1:38: | "That is the purpose of my stop…to have a look and see… that is the law." |

(see attached video).

34. After that statement by Officer Freivald at the 1:38 mark, there is further discussion about the speed Ms. Hudson was driving.  Throughout the videotape, there is a baby crying while occupants appear to be trying to soothe the baby with a bottle.  Ms. Hudson even laughs a bit during the exchange at this point in the videotape when discussing that she drives the speed limit.   The videotape concludes with the following:

| | |
|---|---|
| Unknown male at 2:15: | "Appreciate it." |
| Officer Freivald at 2:16: | "Drive careful and you are free to go." |

(see attached video).

35. The entire exchange between Officer Freivald and Ms. Hudson took place in only one encounter; the police officer only approached the driver's side window once and he never went to his patrol car to call in information about the driver's license or registration. (MKJ T15:12-15); (TH T22:1-17).

36. Officer Freivald issued no citation or summons as a result of his encounter with Ms.

11

Hudson and the officer arrested no one during the traffic stop. (Def. 1st RFA #4); (MKJ T16:1-6).

37. The videotape produced ends at approximately 2 minutes and 16 seconds with Officer Freivald telling Ms. Hudson: "Drive careful and you are free to go." (see attached video).

38. Officer Freivald and the second officer at the scene then briefly engaged one another outside at the rear of Ms. Hudson's vehicle, observed by the some of the occupants in Ms. Hudson's vehicle. (MQJ T20:17 – 21:3); (JF T20:15 – 21:24); (CT T12:5-9).

39. Lt. Corey Thacker of the Nelson County Sheriff's Office testified in his deposition that he was on routine patrol traveling southbound on Route 29 South on October 7, 2016 at approximately 8PM when he saw police overhead blue lights activated on the northbound side of the highway. (CT T8:3 -10:6).

40. Lt. Thacker was driving a marked Nelson County Sheriff's patrol car and wearing his sheriff's department uniform consisting of a dark-brown long-sleeved shirt and dark-brown pants. (CT T6:13-21).

41. Lt. Thacker is a white male with dark hair, and on October 7, 2016, he had no facial hair. (CT Dep. Defense Exhibit 1).

42. Lt. Thacker reported the sighting of flashing blue lights of a patrol vehicle to the Nelson County dispatcher. The Call Detail Report from October 7, 2016 indicates that the call from Lt. Thacker came in at exactly 8:30PM (20:30). The audio recording of the dispatch call more specially reports that the call came in on Friday, October 7, 2016 at 20:30 and 14 seconds. (CT T8:3 -10:6; T15:22 – 17:19).; (CT Dep. Defense Exhibit 2); (Affidavit of Russell Gibson with Exhibits A & B).

43. Lt. Thacker testified that he drove to the first crossover on Rt. 29 and came back up Rt. 29 North to the area of the traffic stop with his overhead blue lights activated. (CT T10:8-25).

44. Lt Thacker initially believed that it was the Virginia State Police involved in a traffic stop. He then reported that it was not the Virginia State Police, but Albemarle County Police Department. He later confirmed that his report to dispatch was incorrect as he subsequently determined that it was City of Charlottesville Police Department. (CT T8:11-17).

45. Lt. Thacker recalled that the traffic stop took place on the left-hand side of the roadway of Rt. 29. (CT T15:17-21).

46. Upon approaching the traffic stop, Lt. Thacker pulled his patrol car immediately behind the police vehicle already on the scene, which he later determined to be Officer Freivald's patrol car. Lt. Thacker saw a minivan immediately in front of Officer Freivald's vehicle. (CT T10:22-25).

47. Lt. Thacker exited his vehicle and walked up towards the front of Officer's Freivald's patrol vehicle. (CT T11:1-4).

48. Lt. Thacker met Officer Freivald as he was walking back towards his patrol car from Ms. Hudson's van. (CT T9:18-21; T11:17-19).

49. Lt. Thacker saw no other officers on the scene with Officer Freivald and Lt. Thacker had no other officers with him. (CT T11:20-24; T15:3-11).

50. Lt. Thacker briefly engaged in conversation with Officer Freivald at Freivald's patrol car for only a couple minutes or less. (CT T12:5-15).

51. Lt. Thacker cleared the call to dispatch at 8:35PM (20:35 and 4 seconds according

13

to the audio recording of the dispatch call). (CT T17:1-9); (Affidavit of Russell Gibson with Exhibits A & B).

52. Lt. Thacker recalled all the vehicles leaving the scene of the traffic stop at or around the time he cleared the call, but he was not certain as to which vehicle left the scene first. (CT T13:7-12).

53. Ms. Hudson and the two other adult occupants in her vehicle assert widely varying estimates regarding the length of the traffic stop. Ms. Hudson estimated that the traffic stop took almost one hour in length. (TH T33:17-20).  Mr. Johnson estimated that it took about 25-30 minutes for the traffic stop (MKJ T15:8-12) and Mr. Marquis Johnson, while admitting that he is not good with timing events, believed that it was 20 minutes or so. (MQJ T15:1-5; T19:5-12).

54. The evidence establishes that the duration of the stop was much briefer than any of those estimates.

55. Officer Freivald estimated that the traffic stop lasted a total of 5-8 minutes in length. (JF T19:7-13).  The witnesses all indicate that two uniformed police officers were present for the duration of the traffic stop and that the videotape began recording at the moment that the officer arrived at the window. Compl. ¶ 9; (Def. 2nd RFA 7-9); (TH T14:8-23); (MKJ T13:1-6; T14:19 – 15:3); (MQJ T10:7-25).  The videotape produced is only 2 minutes and 16 seconds of actual conversation and it ends with the officer stating to Ms. Hudson: "Drive careful and you are free to go." (see video file).

56. All witnesses indicated that Officer Freivald was only at the window once and never came back a second time. (TH T22:1-17); (MKJ T15:12-15).  The Call Detail Report

14

and dispatch recording indicates that Lt. Thacker was only at the traffic stop for 5 minutes or less (Affidavit of Russell Gibson with Exhibits A & B) and by all accounts, Lt. Thacker fits the description of the second officer who was at the rear of Ms. Hudson's vehicle engaged in a conversation with Officer Freivald at the end of the traffic stop corroborating the estimate of 5-8 minutes for the duration of the traffic stop. (CT Depo. Defense Exhibit 1): (MKJ T10:13-20); (MQJ T11:5-12).   There is no credible evidence to support any other version of the time estimate of the traffic stop.[5]

57.  Officer Freivald did not dispute that he *was told* by Capain Mitchell that if he engaged in police activity outside of his jurisdiction he could be considered a private citizen. (JF T28:6-12) (emphasis added).  However, it is unclear when this conversation took place in relation to the traffic stop of Ms. Hudson's vehicle – whether it was before or after the traffic stop in issue and/or whether it was in the context of the internal disciplinary proceedings against Officer Freivald regarding the traffic stop of Ms. Hudson's vehicle.

58. Officer Freivald testified that he was aware of the concept of a citizen's arrest.  (JF T29:23-25).

59. Officer Freivald testified about the ability to engage in police activity outside the jurisdiction to which he was so employed in situations when there is a clear threat to

---

[5]"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  Here, between the videotape produced by Plaintiffs in discovery, the testimony of Lt. Corey Thacker, the audio recording of the call dispatch, the Call Detail Report from the Nelson County Sheriff's Office, and Officer Freivald's testimony that he has never commuted to work with another police officer, the Plaintiffs' estimation of the duration of the traffic stop is completely contradicted.  As such, this Court should not adopt Plaintiffs' version of the duration of the traffic stop for purposes of ruling on this motion for summary judgment.  The credible evidence, which includes a videotape that has not been altered or doctored in any way, supports that the traffic stop lasted no more than 5-8 minutes and that the second officer was in fact, Lt. Corey Thacker of the Nelson County Sheriff's Department (John Doe); not a second Charlottesville Police Officer.

public safety without referencing any specific statutory authority. (JF T28:22-24; T35: 7-10; T38:20-25).

60. Without specifically referencing any statutory authority, Lt. Corey Thacker also referenced the ability to engage in police activity outside of his jurisdiction of Nelson County during instances involving public safety.  (CT T22:24 – 23:12).


## II. MOTION FOR SUMMARY JUDGMENT

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See, *Celetex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) cert. denied, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, at 247-248 (emphasis in original).  The Supreme Court has further clarified this point concerning factual disputes: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling

16

on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

### III. ARGUMENT

**There was no violation of Plaintiffs' Fourth Amendment rights and Officer Freivald is entitled to qualified immunity**.

Plaintiffs urge this Court to adopt the analysis in *Horn v. City of Seat Pleasant*, 57 F. Supp.2d 219 (D. Md. 1999) and to focus almost exclusively on one factor – the status of Officer Freivald as a "private citizen" at the time of the traffic stop.  In fact, *Horn* does not support the Plaintiffs' Motion For Summary Judgement: the court in that case (and in another cases cited by Plaintiffs) ultimately held that the involved officer was entitled to qualified immunity.[6]  In addition, jurisprudential analysis of the issues raised in *Horn* case evolved and changed significantly in the years immediately following *Horn*. The multi-factored analysis first articulated in *United States v. Atwell*, 470 F. Supp.2d 554 (D. Md. 2007) is the proper framework in which to analyze the extra-jurisdictional traffic stop (with no arrest or citation) in this case.

In *Horn*, the officer asserted the defense of qualified immunity, as well as the absence of underlying constitutional violation. *Horn v. City of Seat Pleasant*, 57 F. Supp.2d 219 (D. Md. 1999).  On April 24, 1997, Officer John Morris of the Seat Pleasant Police Department was in uniform, driving an unmarked police car outside of Seat Pleasant's geographical boundaries. *Horn*, 57 F.Supp.2d at 221.  At approximately 11:00AM, he observed a vehicle

---

[6] Plaintiffs cite to *Ross v. Neff*, 905 F.2d 1349, 1353-54 (10th Cir. 1990) as expressly holding that a warrantless arrest outside of the arresting officer's jurisdiction violated the Fourth Amendment and was therefore actionable under §1983 (Plaintiffs' Motion for Summary Judgment p. 4).  However, even in *Ross*, the officers were entitled to qualified immunity. *Id*.  Similarly, Plaintiffs cite to *Pasiewicz v. Lake County Forest Preserve Dist.,* 270 F.3d 520 (7th Cir. 2001) in their pleadings.  However, in that case, the Court granted summary judgment in favor of the defendant police officers based on the fact that there was probable cause to arrest the plaintiff. *Id*.

traveling northbound on Route 301 near Bowie. *Horn*, at 221. Concerned with its speed, Officer Morris began to pace the vehicle. *Id.* He determined that the vehicle was traveling at 75 miles per hour, 20 miles over the posted speed limit. *Id.* He activated his dash lights and displayed his identification card and badge through the windshield. *Horn*, at 221. Unsure of whether Officer Morris was a police officer, Therese Horn, did not pull over. *Id.* When she stopped for a traffic light, Officer Morris exited his car and approached. *Id.* He asked Ms. Horn for her driver's license and registration. *Horn*, at 221. Instead of complying, Ms. Horn said she needed to call Prince George's County Police. *Id.* Officer Morris said he had already done so. *Id.* Ms. Horn then pulled into a nearby service station and attempted to make a phone call to a day care provider. *Horn*, at 221. Officer Morris followed her and ordered her to return to her car. *Id.* She did so, rolled up the windows, and waited for the Prince George's County Police to arrive. *Id.* When the county police officers arrived, Ms. Horn cooperated with them. *Id.* Officer Morris informed the county officers that he was issuing Ms. Horn a citation for speeding. *Id.* At Officer Morris's request, a uniformed county officer stood by as he issued the citation to Ms. Horn. *Id.* Officer Morris subsequently learned that Ms. Horn was the sister and sister-in-law of Prince George's County Police Officers, and that she had been raped previously by someone who posed as a police officer. *Id.* When he learned this, Officer Morris tried to void the ticket and did not appear in court for the traffic charge. *Id.*

As a result of the occurrence, Ms. Horn sued for damages, alleging that Officer Morris had no authority to detain her beyond the boundaries of his sworn jurisdiction. *Horn*, at 221. She claimed that the incident had caused her emotional trauma and had adversely affected her marriage. *Id.* In response to the suit, Officer Morris moved for summary judgment. *Id.*

18

In reviewing the officer's motion, the United States District Court acknowledged at that time (1999) that there was a split in the federal appellate courts as to whether an officer acting outside of his jurisdiction necessarily violates the Fourth Amendment. *Horn*, at 223.  In the absence of binding precedent from the United States Supreme Court or the Federal Court of Appeals for the Fourth Circuit, the *Horn* Court was unwilling to hold that an officer who acts beyond the authority granted by state law violates the federal Constitution in all cases. *Id.*  The Court then determined that even if Officer Morris lacked technical authority to effect Ms. Horn's detention, the absence of clear precedent, coupled with other factors, rendered Officer Morris' actions "reasonable" for qualified immunity purposes. *Horn*, at 226. Accordingly, the officer's motion for summary judgment was granted.

Eight years after *Horn*, *United States v. Atwell,* 470 F.Supp.2d 554 (D. Md. 2007), was decided.  In *Atwell*, the Court concluded that a warrantless search and arrest outside of an officer's jurisdiction did not render the officer's actions unconstitutional.  In *Atwell*, a military patrol officer at Fort Meade observed the defendant speeding and driving erratically. *Atwell*, 470 F.Supp.2d at 559.  The officer pursued the defendant off the military base. *Atwell*, at 560.  After local enforcement declined to execute the stop, the officer administered a field sobriety test, which the defendant failed. *Id.*  The officer then arrested the defendant. *Id.* The defendant moved to suppress the search because the officer exercised law enforcement authority outside his jurisdiction without authorization of federal or state statutory authority. *Atwell*, at 561.  The United States District Court concluded that the stop was not justified under either statute or common law (as a private citizen's arrest), but ultimately upheld the stop and subsequent arrest of the defendant under the Fourth Amendment. *Id.*  In upholding the straffc stop and arrest, the *Atwell* Court did not rely exclusively on the alleged status of

19

the police officer – i.e., whether he was acting as a private citizen or "under the color of law." Instead, the *Atwell* Court analyzed the case based on several factors, with the "most important factor" being whether the officer had a reasonable articulable suspicion that a traffic infraction was being committed and then, whether there was probable cause for the arrest of the defendant. *Id.* at 574.   After finding that the "most important factor" was established (i.e., probable cause for the defendant's arrest), the Court also found that the additional factors of: (1) the offense beginning in the arresting officer's jurisdiction; (2) that the officer did not intend to act outside his territorial jurisdiction;  and (3) that the exigent circumstance of allowing a potentially drunk driver back out on the road, weighed in favor of the reasonableness of defendant's arrest. *Id.*, at 576.   Defendant submits that this multi-factored test (referenced and relied upon in Defendant's motion for summary judgment as the *Atwell* factors) is the most fiting manner in which to determine the reasonableness of an extra-jurisdictional arrest.[7]

As previously articulated in Defendant's motion for summary judgment and his supporting memorandum, and incorporated fully here, the totality of the *Atwell* factors

---

[7] Although the propriety of an extra-jurisdictional traffic stop (with no ensuing arrest or citation issued) has not been addressed by the United States Court of Appeals for the Fourth Circuit, the Fourth Circuit has addressed the issue of whether an officer's arrest of an individual based on an investigation that was conducted outside of his territorial jurisdiction rises to the level of a constitutional violation. *Neal v. Luedtke*, 713 F.App'x 177, 181 (4th Cir. 2017). This is an unpublished opinion, however, and therefore, is not regarded as binding precedent.  However, Officer Freivald submits that the *Atwell* multi-factored test applied in *Neal* (and most recently applied in *Byndon v. Pugh*, 350 F.Supp.3d 495 (N.D.W.Va. 2018) is an appropriate way in which to analyze this particular case (as opposed to *Horn v. City of Seat Pleasant*, 57 F.Supp.2d 219 (D. Md. 1999).  Furthermore, contrary to the assertions of Plaintiffs, Officer Freivald was acting with respect to his powers under Va. Code Ann. § 15.2-1724 and he so testified in his deposition as such without specifically referencing the exact statutory authority: "I was addressing what, in my judgment, was a matter of public safety." (JF T30:13-14).  It is true that Virginia law grants law enforcement officers the authority to perform their duties outside of territorial boundaries "[w]henever the necessity arises," and that such acts "shall be deemed conclusively to be for a public and governmental purpose." Va. Code Ann. § 15.2-1724; See, e.g., *Nexus Servs., Inc. v. Vance* (W.D. Va. 2018) Memorandum Opinion Case. No. 5:17-CV-00072.  Similarly, Lt. Thacker also testified that he has acted outside of his jurisdiction when he was employed by Nelson County Sheriff's Office and in those instances, the best practice was to intervene when there was a public safety issue (such as in the traffic stops he was involved in for DUIs/reckless driving he had observed outside his jurisdiction). (CT T23:1-12).

overwhelmingly establish the reasonableness of Officer Freivald's conduct in this case involving a traffic stop/detention; not a full blown and formal arrest[8].  In addition, there are genuine issues of material fact with respect to this issue.  More specifically, Plaintiffs' motion fails to include the personal observations of Officer Freivald which indicate more than just his personal observation of multiple traffic infractions (and Ms. Hudson's own admission of said traffic violations), but an on-going and escalating dangerous public safety hazard between multiple vehicles on a public highway created by the unlawful actions of Ms. Hudson's vehicle. (JF T11:6 – 14:10); (Def. 1st RFA #1); (Def. 2nd RFA #13).

Plaintiffs' motion inaccurately infers that Officer Freivald knew that he was acting solely as a private citizen at the time of the traffic stop of Ms. Hudson just because he was *told that by his sergeant*, without any reference as to when that conversation happened in relation to this event (JF T28:6-12) and despite Officer Freivald's repeated testimony that he was acting in a capacity to protect the public safety when he effectuated the traffic stop. (JF T28: 24-25; T38:24 – 39:1).  Given these genuine issues of material fact, Plaintiffs' motion for summary judgment must fail.

---

[8] As previously noted, Defendant submits that there is an important distinction to be made between many of the cases involving extra-territorial arrest and this case only involving an extra-territorial traffic stop. See generally, *Knowles v. Iowa*, 525 U.S. 113, 119, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998)(e.g., the usual traffic stop is more analogous to a so-called "Terry stop," see *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest, and thus, it tends to be less intrusive than a formal arrest).

**Even assuming, for purposes of argument only, that Officer Freivald committed a constitutional violation, any such violation was not clearly established at the time of this traffic stop and thus, Officer Freivald is entitled to qualified immunity or alternatively, Officer Freivald was not acting "under color of law."**

In the two decades since *Horn* was decided, and the thirteen years since *Atwell*, Defendant is aware of only two cases decided within the Fourth Circuit concerning the issue of extra-territorial police authority and violations of the Fourth Amendment.[9]   Both of these cases were decided after October 7, 2016 (the date of Officer Freivald's traffic stop of Plaintiffs in this case).  Significantly, both cases involved extra-territorial arrests (not just traffic stops with no arrest or even a citation being issued) and most importantly, the courts in both cases granted the officer's motion for summary judgment despite the extra-territorial actions taken by the police officers.

In *Neal v. Luedtke*, 71 F.App'x 177 (4th Cir. 2017), the Fourth Circuit upheld, in an unpublished affirmance, the trial's court determination that a city's law enforcement officers (City of Crisfield officers) were entitled to qualified immunity for the search of plaintiff's residence located outside their lawful jurisdiction (Somerset County) that led to his arrest and indictment.  In so ruling, the Fourth Circuit (like the district court which granted the officers' summary judgment motion on the grounds of qualified immunity) relied on *United States v. Atwell*, 470 F.Supp.2d 554 (D. Md. 2007), which held that an arrest outside a law enforcement officer's territorial jurisdiction does not, by itself, rise to the level of a constitutional violation. *Id.*  Thereafter, in *Byndon v. Pugh*, 350 F.Supp.3d

---

[9] See, *Neal v. Luedke*, 713 F.App'x 177, No. 16-1278 (4th Cir. November 21, 2017); *Byndon v. Pugh*, 350 F.Supp.3d 495 (N.D. W.Va. 2018).

(N.D. W.Va. 2018), the district court, after applying the *Atwell* factors, determined that Officer Pugh's action of stopping a vehicle outside of his lawful jurisdiction for a minor traffic offense ("driving too closely") was reasonable and held that the officer was entitled to qualified immunity. *Id.*

In the interval between *Horn* (1999) to the date of the traffic stop in this case (October 7, 2016), Defendant submits that the law in this area was anything but "clearly established". Further compounding the lack of clarity on the law in this area concerning extra-territorial police authority and the Fourth Amendment is the line of cases concerning "private citizen arrests" for traffic safety concerns amounting to a breach of the peace (such as DUIs) and the conflicting Virginia statutes concerning the territorial limitations of police officer authority[10].

While Virginia law defines the territorial limits of a police officer's jurisdiction (see, Va. Code Ann. § 19.2-250), Virginia law also grants law enforcement officers the authority to perform their duties outside of their jurisdictional boundaries "[w]henever the necessity arises," in "response to any law enforcement emergency involving any immediate threat to life or public safety" and that such acts "shall be deemed conclusively to be for a public and governmental purpose." Va. Code Ann. § 15.2-1724; See, e.g., *Nexus Servs., Inc. v. Vance* (W.D. Va. 2018) Memorandum Opinion Case. No. 5:17-CV-00072.  That statute further provides that an officer responding to such an immediate threat to life or public safety outside of his territorial limit shall "maintain all of

---

[10] See, e.g., Va. Code Ann. § 19.2-250 and 15.2-1724.

the same immunities from liability enjoyed by [his] respective locality or agency…" Va. Code Ann. §15.2-1742.

Although there is no case law defining what constitutes an "immediate threat to life or public safety" as referenced in Va. Code Ann. §15.2-1742 and Officer Freivald did not specifically recite this exact statutory authority in depositions, it is clear that Officer Freivald was aware that he was empowered to act outside of his jurisdiction and that the exercise of his authority was conditioned upon his personal observation of a "threat to public safety."  (JF T30:13-14 "I was addressing what, in my judgment, was a matter of public safety."); (CT T23:1-12 – Lt. Thacker also testified about engaging in police activity outside his sworn jurisdiction for public safety reasons).  It is not clear whether that reference to "public safety" is attributable to Officer Freivald's understanding of Va. Code Ann. § 15.2-1742, some other provision granting sworn officers authority to act in protecting the public,  or some understanding involving the right of a private citizen to arrest for "breach of the peace" committed in his presence.  However, in any event, this point is illustrative of how uncertain and unclear the law is with respect to extra-territorial police authority.

In addition to conflicting statutory authority governing the territorial limitations of police activity in Virginia, case law concerning "private citizen arrests" compared to the "under the color of office" doctrine further fails to elucidate the law when it comes to the issue of extra-territorial traffic stops.  For example, in *Hudson v. Commonwealth*, 266 Va. 371, 585 S.E.2d 583 (2003), the Virginia Supreme Court upheld the propriety of a police officer's extra-territorial arrest of a defendant for dangerous driving committed in his presence on the grounds that such driving constituted a breach of the peace

24

sufficient to justify a citizen's arrest.  At the time that the police officer in *Hudson* initiated the arrest of the defendant driver, the police officer was off-duty, but in uniform and wearing his badge of authority and driving an unmarked police car. *Id.*  The officer even activated his emergency lights to initiate the traffic stop of the driver. *Id.*  Despite this show of authority, the Virginia Supreme Court held that the police officer was acting as a private citizen at the time he detained the driver and further held that his subsequent arrest of the driver for dangerous driving amounting to a breach of the peace was a lawful and valid citizen's arrest. *Id.*

Similarly, in *West Virginia v. Gustke*, 205 W.Va. 72, 516 S.E.2d 283 (1999), the Supreme Court of Appeals of West Virginia upheld an off-duty police officer's extra-territorial arrest on the grounds that his actions constituted a lawful citizen's arrest for dangerous driving amounting to a breach of the peace. *Id.*  In *Gustke*, a city police officer had completed his shift and was driving his marked police cruiser outside the city limits on an interstate highway toward his home.  Like Va. Code Ann. § 19.2-250, West Virginia has a statute that limits the ability of a police officer to effect an arrest to a circumscribed geographical area.  See, W. Va. Code § 8-14-3.  The off-duty officer observed the erratic operation of a vehicle on the interstate outside of his jurisdiction and engaged his emergency lights and stopped the driver. *Gustke*, 516 S.E.2d 286. The off-duty officer then asked the driver for identification, but made no further investigation and did not collect any evidence. *Id.*  The officer thereafter instructed the driver to stay in his vehicle and detained him until an authorized local officer arrived to arrest him. *Id.*  In upholding the propriety of the initial officer's traffic stop as a citizen's arrest, the Supreme Court of Appeals for West Virginia was unpersuaded by the

25

argument that the officer could not have effectuated a lawful citizen's arrest because he used the indicia of his office (i.e., marked cruiser and overhead lights) to facilitate the traffic stop[11]. *Id.* The court further held that the "under the color of office" doctrine prohibits a law enforcement officer from using the indicia of his office to *collect evidence that a private citizen would be unable to gather.* Id. at 292 (emphasis in original). As such, since the officer effectuating the traffic stop merely asked to see the driver's identification and conducted no further investigation, the court upheld the officer's traffic stop as a valid common law citizen's arrest. *Id.*

In many respects, the facts in the case at bar are a hybrid between the facts in *Gustke* and *Atwell.* Here, as in *Gustke*, the officers were both off-duty and in police uniforms (either driving to a shift or home from a completed shift) in a marked patrol car. In *Atwell*, the officer was a military patrol officer on duty when he observed the defendant speeding and driving erratically. The *Atwell* officer pursued the defendant off the military base. In all three cases, the police officers personally observed traffic infractions outside of their sworn jurisdictional limits that they would characterize as either erratic and/or endangering public safety. In all three cases, the officers engaged their overhead lights to initiate a traffic stop based on personal observations of what they deemed to be traffic violations. In *Atwell*, the military patrol officer, after effectuating the traffic stop, administered a field sobriety test and ultimately, arrested the defendant after he failed such test. In *Gustke* and in the case at bar, both officers

---

[11] Several courts have expressed incredulity that a police officer outside of his territorial jurisdiction might be denied the right to make a citizen's arrest simply because he happens to be wearing a uniform or riding in a police car at the time he witnesses a felony or breach of peace. See *United States v. Atwell*, 470 F.Supp.2d 554, 568 (D. Md 2007) citing *State v. Phoenix*, 428 So.2d 262, 266 (Fla. Dist. Ct. App. 1982). See also *Sealed Juvenile I*, 255 F.3d at 218; *Hudson*, 585 S.E.2d at 587 (finding it "absurd that a law enforcement officer, solely because he happens to be in uniform and in a police car" could not pull someone over for driving erratically).

asked for the driver's identification, but both officers conducted no further investigation and neither of the two officers personally issued any summons or citation.  In *Atwell*, the United States District Court for Maryland held that the military patrol officer lacked probable cause for a citizen's arrest (i.e., the erratic driving the officer observed did not constitute a breach of the peace), but ultimately ruled that the extra-territorial arrest was not unreasonable under the Fourth Amendment to the United States Constitution.  In *Gustke*, the Supreme Court of Appeals of West Virginia held that the off-duty police officer's extra-territorial arrest of an erratic driver was a legal and valid private citizen's arrest.

Given this much confusion as to what extra-territorial action by a police officer is that of a private citizen versus one acting "under the color of law" doctrine, it is easy to see why Officer Freivald appears to maintain conflicting defenses – i.e., (1) that his actions are protected by qualified immunity in the context of applying the *Atwell* factors; and (2) he was acting as a private citizen (as he was so told by his sergeant was (JF T28:6-13) in personally observing a breach of the peace and the fact that he conducted no further investigation and issued no summons or effectuated any arrest at said detention, he was not acting "under the color of law."

The doctrine of qualified immunity shields police officers performing discretionary duties from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of  which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "protects police officers and public officials from claims of constitutional violatons 'for reasonable mistakes as to the legality of their actions." *Merchant v. Bauer*, 677 F.3d 656, 661 (4th

27

Cir. 2012).  This doctrine "applies regardless of whether the officer's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978)); see also *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (noting that qualified immunity protects law officers from "bad guesses in gray areas," such that they are personally liable only for "transgressing bright lines").

An officer is protected from liability under §1983 based on qualified immunity unless (1) the facts alleged show the officer's conduct violated a constitutional right, and (2) the right violated was clearly established at the time the officer's conduct occurred. *Streater v. Wilson*, 565 F.App'x 208, 210 (4th Cir. 2014).  With respect to the second prong, "[f]or a right to be clearly established, its contours 'must be sufficiently clear [such] that a reasonable officer would [have] underst[ood] that what he is doing violates that right.'" *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 398 (4th Cir. 2014) (citing *Anderson v. Creighon*, 483 U.S. 635, 640 (1987)).  A "case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Furthermore, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). It gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Malley v. Briggs*, 475 U.S.

335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  Lastly, while courts should find that police officers should know the law, courts cannot ask that police officers engage in the type of interpretation required by lawyers. See e.g., *Amore v. Novarro*, 624 F.3d 522, 533-34 (2d Cir. 2010)("In determining whether an officer is entitled to qualified immunity, the question os not what a lawyer would learn or intuit from researching case law, but what a reasonable person in defendant's position should know about the constitutionality of the conduct.")

Without a clear pronouncement from the Supreme Court or the Fourth Circuit, this Court cannot hold an officer who acts beyond the authority granted to him by state law violates the federal Constitution in all cases, particularly when there is other statutory authority in direct conflict with that state law and there are common law rights afforded to private citizens to effectuate arrests separate and apart from the statutory authority.  The law is far from clearly established on any aspect of this analysis and from the caselaw, it is difficult to discern when a police officer is "under the color" versus acting as a "private citizen" in the context of extra-territorial traffic stops and arrests. Plaintiffs have not identified any precedent placing the propriety/impropriety of extra-territorial traffic stops as "beyond debate."  Nor have Plaintiffs established when, and in what context, Officer Freivald was *told* that when he engages in police activity outside his swon jurisdiction, he is acting as a private citizen and more importantly, whether that information was conveyed to him before or after the traffic stop involving Ms. Hudson. (Def. 1st RFA #1); (Def. 2nd RFA #13); (JF T28:6-12).  Moreover, while Ms. Hudson admits to two separate traffic infractions just prior to the traffic stop on October 7, 2016, Officer Freivald also personally observed the on-going an escalating public safety

hazard she was causing by her manner of driving that Plaintiffs' current motion neglects to include. (JF T11:6 -14:10; T28:24-25; T30:13-14: T38:24 -39:1).  What constitutes a breach of the peace sufficient for a private citizen's arrest of an erratic driver versus what constitutes an "immediate threat to…public safety" to warrant a police officer going beyond the territorial limits of his sworn jurisdiction pursuant to Va. Code Ann. § 15.2-1724 involves a detailed review of Officer Freivald's personal observations leading up to the traffic stop of Plaintiffs. (JF T11:6 -14:10; T28:24-25; T30:13-14: T38:24 -39:1). Such observations contain genuine issues of material fact sufficient to defeat Plaintiffs' motion for summary judgment on this basis.

**False Imprisonment Claim**:

Lawful detention is an absolute defense to the state law claim of false imprisonment. See, *Lewis v. Kei*, 708 S.e.2d 884, 890 (Va. 2011).  Officer Freivald had a reasonable articulable suspicion to initiate a traffic stop of Ms. Hudson's vehicle based on his personal observations pursuant to the common law right for a citizen's arrest for a breach of the peace as well as pursuant to Va. Code Ann. §§ 19.2-81 and 15.2-1724 as a sworn police officer.  Plaintiffs' motion for summary judgment on this claim must fail as there are genuine issues of material fact as to the totality of the circumstances surrounding Officer Freivald's basis for the traffic stop.  In addition to the two traffic violations admitted by Plaintiffs, Officer Freivald personally observed an on-going and escalating public safety hazard which involved multiple vehicles and was caused by Ms. Hudson's admitted illegal manner of driving exclusively in the left lane without passing

30

or overtaking any other vehicles for several miles. (JF T11:6 -14:10; T28:24-25; T30:13-14: T38:24 -39:1).

**CONCLUSION**

For all the foregoing reasons, and for any additional reasons that may be argued at a hearing on this motion, Defendant Freivald, by counsel, respectfully requests that this Court deny Plaintiffs' motion for summary judgment, grant Defendant's motion for summary judgment and dismiss all claims with prejudice.

Respectfully Submitted,

JON FREIVALD
By Counsel

_____/s/_____
Bonnie J. Lepold, (VSB #44926)
Lepold & Freed, PLLC
414 East Market Street, Suite A
Charlottesville, Virginia 22902
(434) 282-2380 (telephone)
(434) 282-2382 (facsimile)
blepold@lepoldfreed.com
Counsel for Jon Freivald

**MAILING CERTIFICATE**

I HEREBY CERTIFY that on the 23rd day of March 2020, I electronically sent the foregoing Memorandum in Support of Motion for Summary Judgment to Jeff Fogel, Esq., 913 E. Jefferson Street, Charlottesville, VA 22902 (email: jeff.fogel@gmail.com).

_____/s/_____
Bonnie J. Lepold, (VSB #44926)
Counsel for Jon Freivald

31