IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| T.J., O.J., D.J., and J.J., infants, by their next friend TASHA HUDSON, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:18CV00096 |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| JON FREIVALD and JOHN DOE, | ) ) ) | By: Hon. Glen E. Conrad Senior United States District Judge |
| Defendants. | ) | |

    Plaintiffs T.J., O.J., D.J., and J.J., by their mother and next friend, Tasha Hudson, filed this action under 42 U.S.C. § 1983 and Virginia law against Jon Freivald, a police officer employed by the City of Charlottesville Police Department, and another unknown defendant. The action arises from a vehicle stop in Nelson County, Virginia, outside Freivald's jurisdiction. Plaintiffs claim that they were illegally seized in violation of the Fourth Amendment and falsely imprisoned in violation of Virginia law. The case is presently before the court on cross-motions for summary judgment. For the reasons set forth below, the motions will be denied.

**Factual Background**

    Plaintiffs reside with Hudson in Albemarle County, Virginia. 2d Am. Comp. ¶¶ 4–7, ECF No. 14. On October 7, 2016, Hudson, Plaintiffs, Plaintiffs' adult brother, and the children's father, Mark Johnson, drove to Nelson County to visit relatives. Hudson Dep. 4, ECF No. 28-2. While traveling home that night in Hudson's van, which Hudson was driving, the family was stopped by Freivald on Route 29 in Nelson County. Id. at 4–5. At the time of the stop, Freivald was commuting to work in his marked patrol car. Freivald Dep. 7, 10, ECF. No. 28-3.

The parties offer differing versions of what occurred immediately before the stop. They also provide conflicting accounts of what happened during the stop itself.[1] The parties largely rely on deposition testimony to support their respective positions.

I. **Events Leading up to the Stop**

During his deposition, Freivald testified that he first observed Hudson's van north of Lovingston at approximately 8:30 p.m., when he noticed "a cluster of four vehicles" in the northbound lanes of Route 29. Freivald Dep. 10–11. Hudson's van was the first vehicle in the left lane, and "there was a vehicle to the right of her, a little bit forward of her, that was traveling at an identical speed" as Hudson's van. Id. at 11. Freivald testified that the second vehicle in the left lane, behind Hudson's van, "was flashing its high beams fairly regularly." Id. When Freivald approached the vehicles, he used his speedometer to "pace[] the situation." Id. He determined that Hudson was driving 54 miles per hour, which was 6 miles below the posted speed limit.[2] Id.

Freivald further testified that a second vehicle in the right lane appeared to be trying to move around Hudson's van, "but there was not enough room between [the van] and the first vehicle in the right lane for [the second vehicle] to make the gap." Id. at 12. The second vehicle "was cutting in close, . . . but not getting around," because "the vehicle in front of him didn't give him enough room to clear Ms. Hudson's vehicle." Id. According to Freivald, the second vehicle in the right lane unsuccessfully attempted to get around Hudson's vehicle "a couple times." Id. Each time, "he was getting close and kind of nudging left a little bit close to Ms. Hudson's vehicle." Id.

---

[1] Plaintiffs and Freivald also dispute whether another officer was in Freivald's patrol car at the time of the stop. Because this dispute does not affect the resolution of the pending motions for summary judgment, the court finds it unnecessary to address it at this time.

[2] It is undisputed that the posted speed limit in the area at issue was 60 miles per hour.

2

After observing the vehicles over "the course of a half to three quarters of a mile," Freivald "became the third vehicle in the right lane." Id. at 13. According to Freivald, the driver of the vehicle in the left lane, who had been flashing his lights at Hudson, saw Freivald and backed up. Id. At that point, Freivald moved into the left lane behind Hudson and began flashing his lights at her. Id. Freivald testified that he flashed his high beams on three separate occasions "to try to get her attention to get her to pull over and break this impasse." Id. When Hudson failed to do so, Freivald activated his blue lights. Id. at 14. This decision, according to Freivald, was based on his belief that "there was going to become a safety hazard." Id. In particular, Freivald allegedly feared "that there was . . . an incipient road rage incident here with the man in the back of [Hudson] who was tailgating and flashing his lights and the other guy trying to get around." Id. at 14. Freivald testified that he believed that activating his blue lights would "get [Hudson] to pull over so that that would break the impasse and then everybody would be gone and the . . . situation would self rectify at that point." Id.

Plaintiffs' evidence, on the other hand, indicates that Hudson was driving the posted speed limit at the time of the stop. Hudson Dep. 12; Mark Johnson Dep. 13, ECF No. 28-6. During her deposition, Hudson testified that she had her cruise control set to 60 miles per hour and that she always checks to be sure that she is driving the speed limit. Hudson Dep. 12. When asked about the traffic flow on the night in question, Hudson testified that vehicles had been traveling in the right lane but that there was no car directly beside her at the time she was stopped by Freivald. Id.

at 13. Hudson further testified that she "pulled right over" as soon as she noticed "overhead blue lights" behind her.[3] Id. at 10.

Mark Johnson ("Mark"), who was riding beside Hudson in the front passenger seat, testified that he did not know that Freivald was driving behind them until Freivald activated his blue lights. Mark Johnson Dep. 6, ECF No. 28-6. Mark testified that he never saw flashing lights from another vehicle. Id. at 7. He confirmed that they were traveling in the left lane and that Hudson pulled over on the left shoulder as soon as she was able to find a safe area to do so. Id. at 8.

Marquis Johnson ("Marquis"), Hudson's adult son, was sitting in the first rear passenger row on the driver's side of Hudson's van at the time of the stop. Marquis Johnson Dep. 5, ECF No. 28-7. Marquis testified that they were driving in the left lane when blue lights "came on behind [them] out of nowhere." Id. at 6. According to Marquis, Hudson had to pull over on the left side of the road because of "cars coming" in the right lane. Id. at 7.

## II.     Interaction during the Stop

Freivald and Hudson also have differing recollections of what occurred following the stop. Freivald testified that he approached Hudson's vehicle and asked her if she had a Virginia driver's license. Freivald Dep. 17. After Hudson showed him her license, Freivald asked Hudson if she was "aware that under Virginia law when somebody flashes their lights at you, you're supposed to move to the right." Id. According to Freivald, he then informed Hudson that "when you're

---

[3] In response to a request for admission, Plaintiffs denied that Freivald activated his overhead blue lights and instead asserted that Freivald flashed his headlights. Based on the subsequent deposition testimony of Hudson and others, Plaintiffs moved to withdraw the response on the basis that it was contrary to the actual facts. Freivald initially contested the motion by filing a motion in opposition. During the motions hearing, however, Plaintiffs offered to stipulate, for purposes of summary judgment, that Freivald activated his blue lights after flashing his headlights, and the parties ultimately agreed for the court to proceed with that understanding. Accordingly, the court finds it unnecessary to resolve the initial dispute regarding the request for admission, and the related motions will be dismissed without prejudice to refiling, if necessary.

traveling in the left lane you're not supposed to obstruct traffic. And that because she had been traveling slow she was creating a hazardous situation with the vehicles behind and beside her." Id. In response, Hudson told Freivald that "she hadn't seen anybody flashing any lights" and that "she didn't have to pull out of the way of anybody if they weren't the police and that she wasn't aware of any such law." Id.

Freivald testified that he "continued to explain to her that it was in fact state law that . . . when someone flashes their lights you're supposed to move over. And that if not, you're obstructing." Id. at 18. He then noted that "the reason [he] had stopped instead of just going by when she pulled over was to give her the courtesy of explaining why [he] had lit her up to begin with." Id.

Freivald estimated that his conversation with Hudson lasted three to five minutes. Id. at 19. He acknowledged during his deposition that he did not introduce himself to Hudson and that he was "acting as a private citizen" at the time of the stop. Id. at 24, 28. When asked if he was concerned about acting as a private citizen, Freivald responded that he was "concerned about public safety." Id. at 28.

For her part, Hudson testified that the first thing Freivald said upon approaching her vehicle was that "when people flash headlights at you, you need to move." Hudson Dep. 21. After "going on and on about this headlight thing," Freivald "finally . . . just left." Id. at 22. Hudson testified that Freivald never showed her his badge, asked about her driver's license. or called in her license plate, and that he stood "like he was hiding something." Id. at 19, 22. Once their conversation ended and Freivald walked away, Hudson's children directed her attention to his patrol car, emphasizing that Freivald was not with the Virginia State Police or the Nelson County Police Department. Id. at 19. Hudson then "waited right there and got the police car

5

number and was able to see for [herself]" that Freivald worked for the City of Charlottesville Police Department. Id. at 19.

At some point during the stop, Marquis Johnson began video recording the interaction between Hudson and Freivald on his cell phone. Hudson Dep. 24. At the beginning of the recording on record, Freivald can be heard stating that he signaled Hudson three separate times and that she is supposed to be aware of her surroundings.[4] Freivald also emphasized that a driver is required to move over after being signaled. When Hudson indicated that she did not understand why she was pulled over since she was "driving the speed limit," Freivald appears to have responded: "You're right. You're absolutely right. You were driving the speed limit." After further back and forth, Freivald said, "Drive careful and you are free to go."

### III. Another Officer Arrives on the Scene

Corey Thacker, a lieutenant with the Nelson County Sheriff's Office, was on patrol traveling southbound on Route 29, when he saw blue lights activated on the northbound side of the highway. Thacker Dep. 5, 8, ECF No. 28-11. During his deposition, Thacker testified that he turned around after seeing the lights, called dispatch, and drove to the scene of the stop. Id. By the time he arrived, Freivald was walking back to his car. Id. When Thacker asked Freivald "if he was good," Freivald purportedly replied that he had "just stopped a vehicle . . . because it was riding in the left-hand lane." Id. According to Thacker, Freivald indicated that he was "going to . . . give them a warning and be on [his] way." Id. Thacker then returned to his patrol car, cleared the call to dispatch, and headed back to his office. Id. at 8–9.

---

[4] A portion of the recording is docketed at ECF No. 28-10. The recording is only partially audible.

## IV. Freivald is Disciplined for the Stop

Freivald was required to notify his supervisor if he "made a stop outside of jurisdiction." Freivald Dep. 25. By the time that Freivald informed his supervisor, Sergeant Greg Wade, about the stop in Nelson County, Hudson had already contacted the City of Charlottesville Police Department to complain about the incident. Id.

On November 30, 2016, Freivald was issued a letter of reprimand by Lieutenant J.P. Mooney, Jr., pursuant to which his take-home vehicle privileges were suspended for 60 days. The letter explained, in part, as follows:

> The [citizen] complaint alleges this traffic stop occurred outside of your jurisdiction for a minor traffic violation which by any reasonable analysis does not constitute a "serious breach of the peace," a standard set forth by the Supreme Court of Virginia. When you conducted this traffic stop you did so as a private citizen which exposes you to a higher level of liability. During the complaint review process with Sergeant Wade you offered no explanation as to your authority to conduct traffic stops outside the Charlottesville City limits. Instead you merely cited a traffic situation you encountered in Nelson County while traveling to work; specifically a motorist who was traveling in the left lane at 6 miles an hour below the posted speed limit. Had you traveled at this speed from Nelson County to Charlottesville your arrival time would have been approximately 3 minutes later than normal. While a motorist traveling at a slower speed may be a frustrating experience for other motorists, including an off-duty police officer traveling to work, it is not a basis for conducting traffic stops in other jurisdictions. Doing so also gives the "Contempt of Cop" appearance to the driver stopped as well as others who observed the situation. Their interpretation is that of a police officer pulling someone over for simply not getting out of his way. This is a negative reflection on you and the department and is a clear violation of the take-home policy.

ECF No. 28-3.

**Procedural History**

On October 10, 2018, Hudson, on behalf of herself and her four minor children, Mark Johnson, and Marquis Johnson filed suit under § 1983 against Freivald and an unknown defendant. Two days later, they filed an amended complaint. On November 20, 2018, Freivald moved to dismiss the amended complaint on the basis that the claims were barred by the applicable two-year statute of limitations. During a subsequent hearing held on May 22, 2019, the adult plaintiffs conceded that their claims were time-barred. They emphasized, however, that the action was also filed on behalf of Hudson's minor children, who receive the benefit of the tolling provisions set forth in Virginia Code § 8.01-229(A).

On May 23, 2019, the court dismissed the claims filed by the adult plaintiffs and granted the minor children leave to file a second amended complaint through Hudson as their next friend, as required under Virginia law. In Count One of the second amended complaint, Plaintiffs claim that they were unlawfully seized in violation of the Fourth Amendment. In Count Two, Plaintiffs claim that they were falsely imprisoned in violation of Virginia law.

The case is presently before the court on cross-motions for summary judgment filed by Plaintiffs and Freivald. The motions have been fully briefed and argued and are ripe for disposition.

**Standard of Review**

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013); see

also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "When faced with cross-motions for summary judgment, [courts] consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" Bacon v. City of Richmond, 475 F.3d 633, 636–37 (4th Cir. 2007) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). "The court must deny both motions if it finds that there is a genuine dispute of material fact, but if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." Sky Angel U.S., LLC v. Discovery Commc'ns, LLC, 95 F. Supp. 3d 860, 869 (D. Md. 2015) (internal quotation marks and citation omitted).

## Discussion

### I. Claim under Section 1983

The court will first address Plaintiffs' civil rights claim under 42 U.S.C. § 1983. Section 1983 provides "a vehicle for vindicating preexisting constitutional and statutory rights." Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017). The statute imposes civil liability on any person who, acting under color of state law, deprives another person of rights and privileges secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

In this case, Plaintiffs claim that they were unlawfully seized in violation of the Fourth Amendment. In their respective briefs, the parties dispute whether the stop was constitutional, and if not, whether Freivald is nonetheless entitled to qualified immunity. The court will address each issue in turn.

#### A. Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes

9

a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred," Whren v. United States, 517 U.S. 806, 810 (1996), or "reasonable suspicion to believe that criminal activity may be afoot," United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks and citations omitted).

    1.    **Probable Cause**

In this case, the parties dispute whether Freivald had probable cause to believe that a traffic violation was occurring or had occurred. In this context, probable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the driver of a vehicle has committed an offense. United States v. Sowards, 690 F.3d 583, 588 (4th Cir. 2012); see also United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle.") (internal citation omitted). Thus, to determine whether Freivald had probable cause to stop Plaintiffs' vehicle, the court must relate the events leading up to the stop to the elements of the offenses that Freivald believed were being or had been committed. Hayes v. City of Seat Pleasant, 469 F. App'x 169, 172 (4th Cir. 2012). "That analysis requires a proper understanding of the elements of the alleged offense[s]." Id.; see also Rogers v. Stem, No. 1:12-cv-00976, 2013 U.S. Dist. LEXIS 93310, at *21–22 (E.D. Va. 2013) (explaining, in the context of arrest warrants, and the assessment of probable cause "must be made within the context of the specific offense under consideration, which requires this Court to consider centrally the elements of the crimes charged").

Freivald argues that he had probable cause to believe that Hudson violated two state traffic laws: Virginia Code §§ 46.2-804 and 46.2-842.1. The first statute contains "regulations applicable on highways laned for traffic." Va. Code Ann. § 46.2-804. It provides, in pertinent part:

> Any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions existing, shall be driven in the lane nearest the right edge or right curb of the highway when such lane is available for travel except when overtaking and passing another vehicle or in preparation for a left turn or where right lanes are reserved for slow-moving traffic as permitted in this section.

Va. Code Ann. § 46.2-804. A violation of § 46.2-804 is ordinarily punishable by a fine. Id. However, if a driver violates § 46.2-804 and the driver "is a hazard to another person" or commits the violation "with the intent to harass, intimidate, injure or obstruct another person," the driver is guilty of "aggressive driving," a Class 2 misdemeanor offense. Va. Code Ann. § 46.2-868.1. The second statute cited by Freivald applies to divided highways. At the time of the stop, it provided that "[o]n audible or light signal," the driver of an overtaken vehicle to the left "shall move to the right to allow the overtaking vehicle to pass as soon as the overtaken vehicle can safely do so." Va. Code Ann. § 46.2-842.1 (2016).[5]

As indicated above, the record contains conflicting versions of what transpired on Route 29 prior to the traffic stop. These factual disputes go to the heart of whether probable cause existed to stop Plaintiffs for violating either state statute. Consequently, the court concludes that neither side is entitled to summary judgment on the probable cause issue. See Novak v. City of Parma, 932 F.3d 421, 429 (6th Cir. 2019) ("Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry.") (internal quotation marks

---

[5] The statute was recently amended to remove the "audible or light signal" phrase. See Va. Code Ann. § 46.2-842.1 (2020).

and citations omitted); see also Hayes, 469 F. App'x at 172 (finding summary judgment inappropriate where the record contained conflicting versions of what transpired prior to the plaintiffs' arrests).

With respect to the first statute, there is a genuine dispute of material fact as to whether Plaintiffs' vehicle was "proceeding at less than the normal speed of traffic at the time and place and under the conditions existing." Va. Code Ann. § 46.2-804. Although Freivald testified at his deposition that Plaintiffs' vehicle was traveling below the posted speed limit, Hudson testified that she had her cruise control set to 60 miles per hour and that she was driving the posted speed limit at all times in question. Likewise, during their recorded conversation immediately following the stop, Freivald appeared to agree with Hudson that she was driving the speed limit. Given this conflicting evidence, and in light of Freivald's testimony that other vehicles in the same vicinity were traveling at identical speeds, a triable issue of fact exists as to whether Plaintiffs' vehicle was traveling below the normal speed of traffic.

The record also contains conflicting evidence as to whether the right lane was available for travel, as required by § 46.2-804, and as to whether Plaintiffs' vehicle could safely move to the right lane, for purposes of § 46.2-842.1. Although Hudson testified that there were no cars beside her at the time of the stop, Freivald testified that Plaintiffs' vehicle was part of a cluster of vehicles, two of which were traveling in the right lane. Likewise, Marquis Johnson testified that Hudson "had no ability to get over into the right" because of "cars coming." Marquis Johnson Dep. 7–8.

Each of these disputed issues of fact is plainly relevant to the determination of whether Freivald had probable cause to stop Plaintiffs' vehicle for a traffic violation. In light of the conflicting evidence, the court concludes that neither side is entitled to summary judgment on the issue of probable cause.

2.     **Jurisdiction**

It is undisputed that Freivald stopped Plaintiffs' vehicle outside of the territorial jurisdiction of the Charlottesville Police Department. See Va. Code Ann. § 19.2-250 (providing that the jurisdiction of corporate authorities in a town or city, in cases involving offenses against the Commonwealth, "shall extend within the Commonwealth one mile beyond the corporate limits of such town or city"). The parties dispute whether the extraterritorial nature of the stop renders it unreasonable under the Fourth Amendment.

District courts within Fourth Circuit have "noted that an arrest outside a law enforcement officer's territorial jurisdiction does not, by itself, rise to the level of a constitutional violation and explained that a number of factors potentially bear on the reasonableness of an extra-jurisdictional arrest." Neal v. Luedtke, 713 F. App'x 177, 179 (4th Cir. 2017) (citing United States v. Atwell, 470 F. Supp. 3d 554 (D. Md. 2007)); see also United States v. Jones, 428 F. Supp. 2d 497, 503 (W.D. Va. 2006) (Jones, J.) ("The underlying command of the Fourth Amendment is reasonableness, and the fact that an arrest may have violated a territorial-limitation statute, whether it be state or federal, is merely a factor to be considered when deciding whether this constitutional mandate has been followed."). This position is in accord with the weight of authority in other circuits which have addressed similar issues. See, e.g., Oglesby v. Lesan, 929 F.3d 526, 533 (8th Cir. 2019) (emphasizing that "for Fourth Amendment purposes, the relevant question is whether an arrest was reasonable, not whether an arrest violated state law or whether an officer was acting within his geographical jurisdiction"); Martin v. Wood, 648 F. App'x 911, 917 (11th Cir. 2016) (concluding that even if county officers acted outside their jurisdiction in investigating the alleged misconduct, "that violation of state law does not itself violate the Fourth Amendment"); United States v. Ryan, 731 F.3d 66, 70–71 (1st Cir. 2013) (observing that the

weight of authority from other circuits supports the conclusion that an extraterritorial arrest may comply with the Fourth Amendment) (collecting cases); United States v. Gonzales, 535 F.3d 1174, 1183 (10th Cir. 2008) (holding that the officers' actions in stopping the defendant outside their jurisdiction, "although in violation of Colorado law, did not rise to the level of a Fourth Amendment violation"); Pasiewicz v. Lake Cnty. Forest Pres. Dist., 270 F.3d 520, 527 (7th Cir. 2001) (holding that "the officers did not act unreasonably under the Fourth Amendment, even assuming that they acted outside their jurisdiction").

Consistent with these decisions, the court concludes that the fact that Freivald stopped Plaintiffs' vehicle outside his jurisdiction does not, standing alone, render the stop unreasonable under the Fourth Amendment. At most, it is "merely a factor to be considered" in assessing the reasonableness of the seizure. Jones, 428 F. Supp. 3d at 503. The "primary factor," however, "is the 'existence of probable cause.'" Neal v. Luedtke, No. 1:15-cv-01030, 2016 U.S. Dist. LEXIS 24316, at *16 (D. Md. Feb. 29, 2016), aff'd, 713 F. App'x 177 (4th Cir. 2016) (quoting Atwell, 470 F. Supp. 2d at 574). And, for the reasons set forth above, there are disputed issues of fact related to that factor that cannot be resolved on summary judgment. Therefore, neither side is entitled to summary judgment on the merits of Plaintiffs' Fourth Amendment claim.

### B. Qualified Immunity

Freivald also contends that he is entitled to qualified immunity. The doctrine of qualified immunity shields government officials from civil damages liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). In order to claim qualified immunity, "the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within

14

the scope of the defendant's duties.'" Henry v. Purnell, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (quoting In re Allen, 106 F.3d 582, 593, 594 (4th Cir. 1997)). The defendant must then "show either that no constitutional violation occurred or that the right violated was not clearly established at the time it was violated." Hunter v. Town of Mocksville, 789 F.3d 389, 396 (4th Cir. 2015); see also Meyers v. Baltimore Cnty., 713 F.3d 723, 731 (4th Cir. 2013) ("The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense.").

In this case, Plaintiffs initially dispute whether Freivald can claim qualified immunity as a defense since the conduct of which they complain occurred outside the territorial jurisdiction of the City of Charlottesville Police Department. At this stage of the proceedings, however, the court finds it unnecessary to resolve this issue. Even assuming that Freivald was acting within the scope of his official duties and therefore eligible to assert the defense of qualified immunity, the current record precludes an award of qualified immunity on summary judgment.

It has long been clearly established that an officer needs either probable cause or reasonable suspicion to conduct a traffic stop. See Whren, 517 U.S. 806 at 810; Arvizu, 534 U.S. at 273; see also Humbert v. Mayor of Baltimore City, 866 F.3d 546, 561 (4th Cir. 2017) ("Certainly, the Fourth Amendment right to be seized only on probable cause was clearly established at the time of the events at issue here.") (citing Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996)). For purposes of qualified immunity, however, the court must undertake a more particularized inquiry, focusing on whether "a reasonable officer could have believed [the vehicle stop] to be lawful, in light of clearly established law and the information [the stopping officer] possessed." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). Thus, for instance, an officer who lacked probable cause

15

for a stop "nonetheless would be entitled to qualified immunity 'if a reasonable person in the official's position could have failed to appreciate' that probable cause did not exist." Robinson v. Miller, 802 F. App'x 741, 748 (4th Cir. 2020) (quoting Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991)).

To resolve this question, the court must "ascertain the 'circumstances of the case.'" Brown v. Elliott, 876 F.3d 637, 641 (4th Cir. 2017) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). "At summary judgment, in the qualified immunity context as in others, courts must view the evidence in the light most favorable to the party opposing summary judgment." Id. (citing Tolan v. Cotton, 572 U.S. 650, 657 (2014)). "Thus, when resolving the issue of qualified immunity at summary judgment, a court must ascertain the 'circumstances of the case' by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor." Id. at 641–42.

Applying these principles, the court concludes that Freivald is not entitled to summary judgment on the current record. The evidence presented, when viewed in Plaintiffs' favor, indicates that Hudson was driving the posted speed limit in the left lane prior to the stop and that she could not safely change lanes because of nearby vehicles. The court is convinced that no reasonable officer could have believed that there was probable cause to initiate a traffic stop under these circumstances, much less a stop outside the officer's territorial jurisdiction. Accordingly, Freivald is not entitled to summary judgment on the basis of qualified immunity.

### II. Claim under Virginia law

In Count II of the second amended complaint, Plaintiffs assert a supplemental state law claim of false imprisonment. Under Virginia law, false imprisonment is defined as "'the restraint of one's liberty without any sufficient legal excuse." Lewis v. Kei, 708 S.E.2d 884, 890 (Va.

2011). If a seizure or arrest was lawful, a plaintiff "cannot prevail on a claim of false imprisonment." Id.

In addition to disputing whether the traffic stop was supported by probable cause, the parties dispute whether Freivald violated state law by stopping Plaintiffs' vehicle outside his jurisdiction. Freivald acknowledges that the stop occurred outside the jurisdictional boundary limits set forth in Virginia Code § 19.2-250. Nonetheless, Freivald argues that he had authority to initiate the stop pursuant to another state statute or as a citizen's arrest under Virginia common law.

Freivald's first argument is based on § 15.2-1724 of the Virginia Code. This statute, titled "Police and other officers may be sent beyond territorial limits," permits police officers to "go or be sent" outside their assigned jurisdictions under certain circumstances. Va. Code Ann. § 15.2-1724. The portion of the statute on which Freivald relies provides, in relevant part:

> Whenever the necessity arises . . . in response to any law-enforcement emergency involving any immediate threat to life or public safety, . . . the police officers and other officers, agents, and employees of any locality . . . may, together with all necessary equipment, lawfully go or be sent beyond the territorial limits of such locality . . . to assist in meeting such emergency or need . . . .

Id.

The Circuit Court for the City of Charlottesville appears to be the only state court that has interpreted and applied this provision. In Commonwealth v. Valdez, the Court read the statute to "authorize[] police to go from Albemarle County, for example, into the City of Charlottesville, to meet an emergency or need in the City." 87 Va. Cir. 386, 387 (Va. Cir. Ct. 2014). In the case before it, officers with the Albemarle County Police Department went to the defendant's residence in the City of Charlottesville and arrested him for an alleged "hit and run" that occurred in Albemarle County. Id. at 386–87. The Circuit Court concluded that § 15.2-1724 did not give the

17

police officers authority to arrest the defendant outside their jurisdiction, since "[t]here was no emergency existing in the City that Albemarle County Police were on notice of to require their presence." Id. at 387.[6]

Based on the current record, the court is unpersuaded by Freivald's reliance on § 15.2-1724. This was not a situation in which Freivald was "sent" beyond the territorial limits of the Charlottesville Police Department to "assist in meeting [a law-enforcement] emergency." Va. Code Ann. § 15.2-1724. Nor did he "go" from the City of Charlottesville to Nelson County "to assist in meeting such emergency." Id.; Valdez, 87 Va. Cir. at 387. Instead, Freivald allegedly observed one or more problematic traffic violations in Nelson County while commuting from his home there. Even when the evidence is construed in Freivald's favor, the court is unable to conclude that § 15.2-1724 authorized him to stop Plaintiffs' vehicle outside his territorial jurisdiction.

Freivald's second argument—that the stop was a valid citizen's arrest—presents a closer question. In Hudson v. Commonwealth, the Supreme Court of Virginia concluded that a law enforcement officer acting outside his territorial jurisdiction has the same authority to make a citizen's arrest as would any other private citizen. 585 S.E.2d 583, 587 (Va. 2003). Under Virginia common law, a private citizen may arrest another for a breach of the peace committed in his presence. Id. at 588. In the case before it, an off-duty officer for the City of Petersburg activated his patrol car's emergency lights and caused the defendant to stop on Route 288 in Chesterfield County after observing the defendant driving in an erratic manner. Id. at 584. The

---

[6] The Office of the Attorney General of Virginia has also recognized the limited scope of this exception to the general territorial jurisdiction of municipal police officers. In particular, the "Office . . . has previously clarified that the 'necessity' described in § 15.2-1724 relates to 'exceptional situations of immediate necessity' and not to all 'routine' situations requiring police response." 2020 Op. Va. Att'y Gen., 2020 Va. AG LEXIS 40, at *4 n.2 (Va. A.G. Dec. 18, 2020) (quoting 1983-1984 Op. Va. Att'y Gen. 109, 109).

defendant was ultimately convicted of refusing to submit to a breath test in violation of Virginia Code § 18.2-268.3. Id. at 585. On appeal from the denial of a motion to suppress, the Supreme Court found that the defendant's "dangerous driving, in and of itself, regardless of whether he was under the influence of intoxicants, constituted a breach of the peace committed in the presence of [the stopping officer]." Id. at 588. Accordingly, even though the stopping officer "lacked statutory authority as a police officer to detain Hudson, [he] was lawfully entitled to effect a citizen's arrest for the breach of the peace by Hudson committed in his presence." Id. at 590.

After considering the parties' arguments, the court is of the opinion that the issue of whether the stop in this case was a valid citizen's arrest cannot be decided on summary judgment. If a jury were to credit Plaintiffs' evidence, it could find that Hudson was merely driving the posted speed limit in the left lane, while other vehicles were traveling behind and beside her. Under those circumstances, no reasonable jury could find that Hudson committed a breach of the peace in Freivald's presence. On other hand, if a jury were to credit Freivald's testimony, it could find that Hudson was driving less than the posted speed limit in the left lane for nearly a mile, and that Freivald observed a potential "road rage incident" and "safety hazard" resulting from Hudson failing to respond to the flashing lights of the vehicle behind her and obstructing other vehicles from passing her. Freivald Dep. Tr. 14. Construing all inferences in Freivald's favor, a reasonable jury could potentially find that the aggressive driving described by Freivald, which is punishable as a misdemeanor offense under Virginia law, also constituted a breach of the peace.[7] See Hudson, supra; see also State v. Chavez, 96 P.3d 1093, 1095 (Ariz. Ct. App. 2004) (noting that

---

[7] In reaching this decision, the court recognizes that there is evidence in the record suggesting that Freivald made no mention of a perceived safety hazard immediately following the stop, including documents prepared by the City of Charlottesville Police Department and Thacker's deposition testimony. On summary judgment, however, it is not the court's job to "weigh the evidence" or to "disregard stories that seem hard to believe." Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991). Instead, such credibility determinations are within the province of the jury. Id.; see also Reeves v. Sanders Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

"other jurisdictions have held, and legal treatises recognize, that dangerous or reckless driving, including DUI, amounts to a breach of the peace allowing a private citizen to stop, detain, or arrest the driver") (citations omitted).

For these reasons, the court concludes that genuine issues of material fact exist with respect to whether Freivald lawfully stopped Plaintiffs' vehicle outside his jurisdiction. Accordingly, neither side is entitled to summary judgment on the claim of false imprisonment.

### Conclusion

For the reasons stated, the cross-motions for summary judgment filed by Plaintiffs and Freivald will be denied. Given the nature and extent of any claim for damages that may exist in this case, the court finds it appropriate to refer the case to a magistrate judge for mediation so that these issues can be further considered. If the mediation is unsuccessful, the magistrate judge shall notify the court and a schedule will be set for any remaining pretrial proceedings. The court will enter an appropriate referral order forthwith.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This  25th  day of March, 2021.

_____
Senior United States District Judge